Laramore, Judge,
delivered the opinion of the court:
Plaintiff[1] sues to recover an alleged overpayment of taxes for the year 1955. The Commissioner of Internal Revenue proposed to assess a tax deficiency in the sum of $6,318.66 on *808 the basis of disallowance of the deduction of $5,000 for legal fees, and on the basis of including in plaintiff’s gross income a net long-term capital gain of $8,737.31, representing the difference between the tax basis to plaintiff of 500 shares of du Pont stock transferred to Alice M. Davis, his former wife, during 1955 and the fair market value of such shares as of the date of transfer to her. The cost basis of the 500 shares of stock transferred on March 21, 1955, was $74,775.37. This stock had a fair market value on that date of $82,250, or an increase in value over the cost basis of $7,474.63, one-half of which gain, or $3,737.31, was taken into account in the proposed deficiency assessment.
On February 14, 1958, plaintiff paid to the District Director the amount of $6,961.95, representing the asserted deficiency for 1955 in the amount of $6,318.66, plus interest of $643.29.
On April 8, 1958, plaintiffs filed their claim for refund of Federal income taxes paid for 1955 in the sum of $13,642.29. This claim was based on the failure to include all of the $12,506 of legal fees paid by Mr. Davis to a Mr. Young and a Mr. Morford on January 27, 1955, for legal services. Plaintiffs asserted in their claim that $2,500 was on that date paid to each attorney, or a total of $5,000, for legal services in connection with various Federal tax matters arising out of negotiations and execution of a separation and property settlement agreement between Mr. Davis and Alice M. Davis, his former wife. Plaintiffs further asserted that additional sums as legal fees, $5,006 to Mr. Young and $2,500 to Mr. Morford, were paid on January 27, 1955, for services in connection with the negotiations and execution of the same settlement agreement primarily incurred in connection with the protection of Mr. Davis’ position as a stockholder, officer, and director of du Pont. This claim further asserted that the inclusion in income of the net long-term capital gain of $3,737.31 on the 500 shares of du Pont stock transferred to Alice M. Davis on March 21, 1955, was erroneous, because such transfer was pursuant to the same separation and property division agreement and did not result in any income or gain to the taxpayer.
*809 By registered letter dated September 23,1958, the District Director of Internal Revenue for Delaware notified plaintiffs of the disallowance in full of their claim for refund for the year 1955. This suit results.
Plaintiff contends in this suit that he is entitled to a deduction for two types of legal fees paid by him: First, legal fees paid for tax advice, and second, legal fees incurred in connection with the matter principally involving the protection of plaintiff’s position as a stockholder, director, and officer of the du Pont Company. His contention with respect to the taxable gain on the stock transferred will be discussed later.
Plaintiff points to section 212(3) of the Internal Revenue Code of 1954, which was applicable for the calendar year 1955, in support of his contention that legal fees paid for tax advice in connection with the negotiations of the property division and separation agreement are deductible.
Section 212(3) provides:
Sec. 212. EXPENSES FOR PRODUCTION OF INCOME.
In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
* Xt * * :R
(3) in connection with the determination, collection, or refund of any tax.
Plaintiff then points to the Treasury Regulations under the above-quoted statutory provision as supporting his contention.
Treasury Regulation § 1.212-1 reads as follows:
§ 1.212-1. Nontrade or nonbusiness expenses.—
(1) Expenses paid or incurred by an individual in connection with the determination, collection, or refund of any tax, whether the taxing authority be Federal, State, or municipal, and whether the tax be income, estate, gift, property, or any other tax, are deductible. Thus, expenses paid or incurred by a taxpayer for tax counsel or expenses paid or incurred in connection with the preparation of his tax returns or in connection with any proceedings involved in determining the extent of tax liability or in contesting his tax liability are deductible.
*810 Section 212(3) plaintiff says applies for the reason that the evidence shows that both Thomas Crawley Davis and his former wife were constantly aware of Federal income and gift tax problems which would vitally affect both parties in the negotiation. Further, that a new income tax code had just previously been enacted which involved extensive revisions of the prior internal revenue laws, and that tax advice was sought from attorneys for both parties. Consequently, plaintiff contends that he is entitled to deduct the fees paid as services for “* * * tax counsel or expenses paid or incurred in connection with the preparation of * * * tax returns * *
We have no doubt that Congress in enacting section 212, supra, meant to grant a deduction for legal fees in connection with a determination, collection, or refund of any tax. The question then is whether the fees paid by plaintiff come within the purview of the Act. In the light of the Treasury Regulations promulgated thereunder, we think the question can only be answered in the affirmative. The Regulation, section 1.212-1, quoted above, specifically provides that expenses paid or incurred for tax counsel “* * * in connection with any proceedings involved in determining the extent of tax liability * * * are deductible.” Therefore, it seems clear that the statute and regulations are broad enough to cover the deduction asked for.
The facts here show that in negotiating the separation and property settlement agreement, both Mr. Young and Mr. Morford considered the Federal income and gift tax consequences flowing from the various phases of the proposals made during the course of negotiations. Each attorney, however, considered such problems from the standpoint of his own client, and this same concentration for the interests of his own client was practiced by each attorney in negotiating the overall aspects of the property settlement agreement.
Further, the facts show that the bills for attorneys’ fees were separated into two categories — one for services regarding the separation agreement, and the other for services in regard to tax matters. In this connection there is no evidence indicating that such allocation was done in bad faith, *811 and the cases are legion holding that absent such evidence, such allocation should be accepted. Maine Steel, Inc. v. United States, 174 F. Supp. 702, 716 (1959); Anita M. Baldwin., 10 B.T.A. 1198 (1928). Cf. Joseph Frank, 22 T.C. 945 (1954), aff’d per cur. 226 F. 2d 600, (1955) ; Bryant Heater Co. v. Commissioner, 231 F. 2d 938, (1956).
In view of the foregoing, it seems obvious that the fees paid by plaintiff for consultation and advice in tax matters arising in connection with the settlement agreement are properly deductible from gross income.
This is not to say, however, that the fees paid to his former wife’s attorney, Mr. Morford, are also deductible. In spite of the fact that Mr. Davis was legally liable for his wife’s attorney’s fees, the evidence conclusively shows that Mr. Morford worked exclusively for his client, Mrs. Davis, and considered the problems from the standpoint of his client alone. Certainly then it cannot be said that Mr. Morford’s advice was directed to plaintiff’s tax problems, and in order to qualify for a deduction, we think the attorneys’ fees must be directly and only connected with the taxpayer’s estate. Consequently, we hold that only the attorney’s fees paid by plaintiff to his personal attorney, Mr. Young, for tax advice, are properly deductible from his 1955 gross income.
Next we turn to the question of whether the taxpayer is entitled to deduct the amount paid Messrs. Young and Mor-ford, representing charges for legal services in connection with the negotiation of a property division and separation agreement.
In this connection plaintiff contends that the legal fees were paid in connection with the preservation of his position as a stockholder, director, and officer of the du Pont Company and that said fees are deductible 'under the provisions of section 212(1) (2) of the Internal Eevenue Code of 1954, supra.
At the outset of the discussion respecting this issue, we point out that the taxpayer is not entitled to a deduction for personal, living or family expenses under section 262 of the Internal Eevenue Code of 1954, supra, and Treasury Eegulation § 1.262-1 (b) (7).
*812 Section 262 of the Internal Kevenue Code of 1954, supra, reads as follows:
PERSONAL, LIVING, AND FAMILY EXPENSES
Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living or family expenses.
Treasury Regulation section 1.262-1 (b) (7) provides:
Personal, Living, and Family Expenses. — (a) In general. In computing taxable income, no deduction shall be allowed, except as otherwise expressly provided in chapter 1 of the Internal Revenue Code of 1954, for personal, living and family expenses.
(b) Examples of personal, living, and family expenses. Personal, living, and family expenses are illustrated in the following examples:
*****
(7) Generally, attorney’s fees and other costs paid in connection with a divorce, separation, or decree for support are not deductible by either husband or the wife. * * *
Therefore, in order to bring himself under the section permitting the deduction, plaintiff must show that the legal expenses were incurred in matters directly related to his business or the management, conservation or maintenance of property held for the production of income. See Port v. United States, 143 Ct. Cl. 334.
Plaintiff cites the cases of McMurtry v. United States, 132 Ct. Cl. 418 (1955); Baer v. Commissioner, 196 F. 2d 646 (1952); Bowers v. Commissioner, 243 F. 2d 904 (1957) ; and Fisher v. United States, 157 F. Supp. 364 (1957).
Defendant in opposition cites the U.S. Supreme Court decision in the case of Lykes v. United States, 343 U.S. 118 (1951), wherein the Supreme Court reviewed the legislative history of section 23(a) (2) of the 1939 Code, the predecessor to section 212 of the 1954 Code, which showed that Congress intended to allow deduction for income-producing activities of a commercial nature only and did not intend to allow the deduction of any expense designed to aid taxpayer to retain their property. The Supreme Court in Lyhes stated at page 125:
*813 Legal expenses do not become deductible merely because they are paid for services which relieve a taxpayer of liability. That argument would carry us too far. It would mean that the expense of defending almost any claim would be deductible by a taxpayer on the ground that such defense was made to help him keep clear of liens whatever income-producing property he might have.
Admittedly, some courts have departed from the philosophy of the Lylees decision. Baer v. Commissioner, supra; McMurtry v. United States, supra; Bowers v. Commissioner, supra; Owens v. Commissioner, 273 F. 2d 251 (1959); Fisher v. United States, supra; and Patrick v. United States, 186 F. Supp. 48 (1960). However, many courts have not followed the departure or have distinguished the case on factual grounds. Lewis v. Commissioner, 253 F. 2d 821 (1958); Tressler v. Commissioner, 228 F. 2d 356 (1955); Howard v. Commissioner, 202 F. 2d 28 (1953); Richardson v. Commissioner, 234 F. 2d 248 (1956); Smith's Estate v. Commissioner, 208 F. 2d 349 (1953); Donnelly v. Commissioner, 16 T.C. 1196 (1951); Estate of Walsh v. Commissioner, 28 T.C. 1274 (1957); Douglas v. Commissioner, 33 T.C. 349 (1959).
Of course, the defendant contends the rule in the Lylees case as followed by the court in the case of Lewis v. Commissioner, supra, is correct. On the other hand, plaintiff is just as positive that the McMurtry, Baer, etc., cases provide the correct rule.
However, we believe that it is not necessary here to choose which decision is correct in the premises. We believe the cases cited by plaintiff are factually distinguishable from the facts in the case at bar.
The MeMurtry decision, supra, related to a situation wherein the plaintiff’s position to some extent depended on the amount of his stockholdings in the company.
In the Baer case, supra, the taxpayer owned a controlling interest in a closely held corporation and to have acceded to his wife’s demands would have resulted in not only loss of control of the company and loss of dividends, but no doubt would have resulted in loss of his salary as well, if other and adverse parties gained control.
*814 In Bowers v. Commissioner, supra, and Patrick v. United States, supra, as well as Fisher v. United States, supra, practically the same situation as in Baer, supra, existed. It was necessary for Bowers to retain the stock in order to maintain his control, management and income.
In the present case by contrast, almost all the legal expenses were incurred by reason of the marital rift between Mr. and Mrs. Davis. As a consequence thereof, his attorney’s fees were practically all incurred in an effort to hold to a minimum the amount necessary to effect a property settlement. It naturally follows that the attorney’s fees paid for Mrs. Davis’ attorney were to gain a maximum amount in the property settlement agreement. Furthermore, we believe from the evidence that in any event plaintiff has failed to prove that retention of the stock was necessary to maintain him as an officer and director of du Pont. As a matter of fact, at the time of Davis’ election to the Board, his stockholdings were substantially less than those of any other person nominated by the management for election to the Board. Furthermore, during Mr. Davis’ service as a director, every person nominated by the management of du Pont was elected by the stockholders as a director.
Therefore, we think the facts of this case more nearly come under the rule laid down by the court in the cases of Lewis v. Commissioner, supra; Tressler v. Commissioner, supra; Howard v. Commissioner, supra; Richardson v. Commissioner, supra; Smith’s Estate v. Commissioner, supra; Donnelly v. Commissioner, supra; Estate of Walsh v. Commissioner, supra; Douglas v. Commissioner, supra.
The above cases all stand for the proposition that attorneys’ fees generally seek to conserve estates but are not necessarily the basis for a deduction under the Internal Revenue Code. Thus we believe the rule of the Lewis case, supra, is the correct one in these premises; i.e., following the Supreme Court’s decision in Lykes v. United States, supra, the Court held that the legal expenses were not deductible. The above reasoning was followed by this court in the case of Port v. United States, supra.
*815 Thus we hold that the attorneys’ fees paid to both lawyers constituted personal expenses which are nondednctible under section 262 of the 1954 Code, supra.
The next and final contention of the taxpayer is that the taxpayer did not realize taxable gain by virtue of the stock transfer to his former wife pursuant to the property settlement agreement, and consequently the inclusion in income of the net long-term capital gam was erroneous.
The facts respecting the above situation are these: Pursuant to the separation agreement the taxpayer, Davis, transferred 500 shares of du Pont stock to his former wife, Alice M. Davis, in 1954. The taxpayer’s cost basis of the stock was $74,775.37 and the fair market value at the time of transfer was $82,250. The difference was taxed as capital gain under section 1001 of the Internal Revenue Code of 1954, 26 TJ.S.C. §1001 (1958 Ed.) which provides:
DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS
(a) Computation of Gain or Loss. — The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.
(b) Amoimt Realized. — The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.
Plaintiff contends that the transfer of the stock was not in satisfaction of Alice M. Davis’ right to support and maintenance, but was a part of a division of property. Plaintiff argues that Mrs. Davis’ rights to support and maintenance were satisfied by the payment of $550 per month and the payment of dividends on a maximum of 1,000 shares of du Pont stock. This is so, plaintiff says, because the division of property was contained in one paragraph of the separation agreement, whereas the payments in lieu of alimony were in another paragraph.
It is the defendant’s contention that under the rule laid down in the case of Commissioner v. Mesta, 123 F. 2d 986 *816 (1941), cert. denied 316 U.S. 695 (1942), and Commissioner v. Halliwell, 131 F. 2d 642 (1942), cert, denied 319 U.S. 741, the increment in value was clearly taxable gain.
Plaintiff then argues the incorrectness of the Mesta decision, sufra, and concludes with the statement in his brief that “plaintiffs are not prepared to concede the correctness of the Mesta decision, but believe that since the rule of that case is not here applicable it is not necessary to further consider the Mesta case.” Plaintiff further contends that the Mesta decision is not applicable because that case involved a transfer of property in connection with a division of property and not a transfer in satisfaction of the husband’s (plaintiff Davis) obligation to support. To support this contention plaintiff cites the case of Commissioner v. Marshman, 279 F. 2d 27 (1960), cert. denied 364 U.S. 918.
Thus the situation is this: The Court of Appeals in the Third Circuit in a case involving an almost identical proposition, in 1941 found that there was a taxable capital gain. The Supreme Court denied certiorari. In 1942 the Court of Appeals, Second Circuit, in a substantially same situation reversed the Tax Court and found against the taxpayer. Commissioner v. Halliwell, supra. The Supreme Court denied certiorari. The ruling in the Mesta case, supra, was cited with approval and followed by the court in Halliwell. Then in 1960, after the Tax Court had followed the 1941 and 1942 decisions, the Court of Appeals for the Sixth Circuit in the Marshman case, supra, reversed the Tax Court and specifically rejected the rule of the two cases in the Second and Third Circuit. The Marshman situation also is almost identical with the facts in the instant case. On December 12,1960, the Supreme Court denied certiorari in the Marshman case. The result is that we are faced with two precedents pointing in opposite directions and an attempt to distinguish the two is impossible.
Since there is no clear ground for distinguishment between the rule of the Mesta-Halliwell cases and the Marshman case, it behooves us to decide which rule is the correct one in the premises. While admittedly it is a troublesome question, we are of the opinion that the facts of the instant case more nearly come under the reasoning and the rule of the Marsh *817 man case. We say this because the statute, section 1001 (b), expressly states that the amount realized from the sale or other disposition of property shall be the sum of any money received, plus the fair market value of the property received. We think as did the court in Marshman, supra, that the measurement of gain cannot be the fair market value of the property transferred. We also believe, as did the court in Marshman, that the measure of the value of the wife’s right to maintenance and support was dependent upon so many uncertain factors that neither the taxpayer nor a revenue officer could do more than guess at it.
Furthermore, to say that the fair market value of the property received is the same as the fair market value of the property given up, is the use of a formula different from the well-established formula for determining fair market value. Fair market value is the price at which property would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or sell. Again we agree with the court in the Marshman case that a transaction between a husband and a wife made under the emotion, tension and practical necessities involved in a divorce proceeding does not comply with this rule.
Under the evidence of this case, like Marshman, many demands were made, many concessions were made, and under these circumstances values are lost sight of. This is especially true under the circumstances of this case wherein the husband even became ill because of the tensions resulting from the marital troubles. So it is reasonable to say that in some measure the husband was willing to pay at least some amount in order to have the marriage terminated. In these circumstances, the value of what was given up is no criterion of the fair market value of the “property” received.
For the above reasons, we cannot agree with the ruling in the Mesta case that the fair market value of the release by a wife of her alimony and dower rights against her husband and his estate is properly determined by ascertaining and giving to it the fair market value of the property which she received from her husband.
If the “property” received by Davis had no fair market value, or if none has been shown, it may be economic gain but *818 it is not taxable gain by reason of the express provision of section 1001 (b). Champlin v. Commissioner, 71 F. 2d 23, 29.
Therefore, we believe that T. C. Davis did not realize taxable gain by virtue of the 1955 transfer of stock pursuant to the property settlement agreement. Consequently, plaintiff is entitled to recover the amount paid pursuant to the inclusion of capital gain in his 1955 tax, in addition to the amount paid by reason of the inclusion of attorney’s fees paid his attorney for tax advice.
The exact amount of recovery will be determined pursuant to Rule 38(c).
It is so ordered.
Durfee, Judge; MaddeN, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
BINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
I» Plaintiffs are citizens of the United States and residents of the State of Delaware. At the end of the calendar year 1955, they were husband and wife.
2. Plaintiff, Thomas Crawley Davis, had been previously married to Alice M. Davis, such marriage having existed from March 1,1941, to January 5, 1955. On the latter date, Alice M. Davis, hereinafter referred to as Mrs. Davis, was granted an absolute and final decree of divorce from Mr. Davis upon the stated ground of “extreme cruelty, mental in nature,” by the Second Judicial District Court of the State of Nevada. The separation and property settlement agreement of the parties, hereinafter mentioned in these findings, was approved by the Nevada court and incorporated by reference in its decree which, by its terms, ordered and directed the parties to comply with and to execute the terms and conditions of the agreement. Both parties were represented at the proceedings by Nevada attorneys who had not participated in any way in the preparation and execution of the agreement. Mrs. Dams appeared in person at the trial, but Mr. Davis did not personally participate.
*819 3. Since 1934, Mr. Davis has been associated with E. I. du Pont de Nemours & Company, hereinafter referred to as du Pont or the company, in various capacities as an employee, officer, director and stockholder. His employment record with du Pont from November 16, 1934, to the date of the trial of this case on April 30,1959, was as follows:
11-16-34 to 11-30-41 Manager, Tax Division, Treasurer’s Department
12-1-41 to 8-26-44 Assistant Comptroller, Treasurer’s Department
8-27-44 to 5-19-46 Assistant Treasurer, Treasurer’s Department
5-20-46 to 1-18-48 First Assistant Treasurer, Treasurer’s Department
I-19-48 to 12-20-53 Treasurer of the company
12-21-53 to 4-30-59 Member, Board of Directors, Member, Executive Committee, Vice President
II-1-54 to 4-30-59 Member, Finance Committee
4. From 1902 to the present time, du Pont has had a policy and practice of granting bonuses to its officers and employees. Prior to 1943, such bonuses were awarded in the form of du Pont stock. Due to the impact of the Federal withholding tax on incomes, such bonus awards were paid entirely in cash from 1943 to 1946. Beginning in 1947, such bonuses were paid partly in du Pont stock and partly in cash.
One of the primary purposes of the company in awarding bonuses in the form of stock was to tie the bonus awardees to the company as stockholders and thus intensify their interest in the company’s business. It was generally known that the company’s top officials expected bonus awardees to retain their du Pont stock, the recognized exceptions being in cases of necessity to sell bonus stock to pay income taxes or to purchase a suitable home.
5. Prior to the annual meeting of the du Pont stockholders, the secretary of the company each year prepares an analysis of the holdings and dispositions of stock by executives of the company. The president, vice presidents, and directors are and were expected to explain any substantial disposition of their stock.
Proxy statements issued by du Pont to its stockholders prior to each annual meeting show the holdings of du Pont *820 stock by those persons nominated by the du Pont management for election or reelection by the stockholders to the company’s board of directors.
6. During November 1958, Mr. Davis was advised by the president and by the chairman of the board of du Pont that he was being considered for election as a director, vice president and member of the executive committee of the company. At that time Mr. Davis had 2,842 shares of du Pont common stock registered in his name.
Effective December 21,1953, Mr Davis was elected by the board of directors as a director, vice president, and member of the executive committee of du Pont. As a director, Mr. Davis was subject to reelection by the stockholders at the succeeding annual meetings in April of each year. Mr. Davis has continued to hold such offices up to the present time. Since November 1, 1954, Mr. Davis has also been a member of the finance committee of the company.
7. The changes in the du Pont stock holdings of Mr. Davis from February 28, 1953, through 1958, were as follows:

The disposition of 200 shares on September 1, 1953, 500 shares on March 21, 1955, and 500 shares on March 27,1956, were to Mrs. Davis, as hereinafter related in these findings. The evidence indicates that the other dispositions were in the main for the purpose of paying Federal income taxes, and meeting the cash payments required by the separation and property settlement agreement.
*821 All of Mr. Davis’ du Pont stock holdings were acquired by him through bonus awards by the company.
8.The income of Mr. Davis for the years 1949 through 1953 was as follows:

9.For the calendar years 1954 and 1955, Mr. Davis’ adjusted gross income amounted to the respective sums of $264,984.69 and $317,865.16, of which the following represented payments from du Pont:

10.Mr. Davis’ net worth statement as of July 1,1954, was as follows:
Cash in hank — Wilmington Trust Co_$28, 073
Shares of du Pont common stock:
Registered in his name_3,216 shares
Deduct: held by company as unearned bonus- 802 shares
Remainder (including 100 shares pledged to Farmers Bank)-2,414 shares @ $134.25 324,070
Insurance policies having cash surrender value: Travelers Insurance Co. $10M policy_ 5, 000
U.S. Veterans Administration $10M policy_ 5, 000
Great Western Life Assurance Co. $50M policy_ 21, 717
Pan American Life Assurance Co. $50M policy_ 17, 493
Dominion Life Assurance Co. $50M policy_ 16,407
Home on Kennett Pike___ 76, 000
*822 Home furnishings_$15,000
Automobiles (3)- 3,000
511,769
1954 Federal income tax unpaid.. $82, 079
Mortgage on home- 18, 000
Borrowing from Farmers Bank- 63, 761
- 163,840
Net Worth — July 1, 1954- 347, 929
As of July 1, 1954, delivery of 802 of the 3,216 shares of du Pont stock registered in Mr. Davis’ name bad been deferred to later years. Under the du Pont bonus plan, the 802 shares were subject to forfeiture in the event that prior to actual delivery to him, Mr. Davis’ services with du Pont were terminated other than through death or retirement pursuant to the company’s program.
All of the property of the parties involved in the property settlement negotiations was owned by Mr. Davis subject only to the marital rights of Mrs. Davis under the laws of the State of Delaware.
11. For a period of many years, Mr. and Mrs. Davis had had many disagreements of a personal nature, which finally led Mrs. Davis to seek a separation in June 1954. About the middle of the year 1953, Mrs. Davis requested Mr. Davis to transfer one-half of his property into her name, including 1,500 shares of du Pont stock, but she did not then request a divorce or separation. Mr. Davis rejected these property demands, but offered to make future transfers of du Pont stock to Mrs. Davis as long as his stock holdings did not fall below 3,000 shares. Mr. Davis advised Mrs. Davis that otherwise his position with du Pont would be seriously jeopardized by stock transfers. On September 1, 1953, Mr. Davis transferred 200 shares of du Pont stock to Mrs. Davis to allay her demands. By December 1953, their relations had become so strained that they could not converse without quarrelling and there was great unhappiness in their home. Mrs. Davis’ demands for a property division became more insistent, and in February 1954 she refused to sign a joint Federal income tax return until her request for property had been met.
*823 In the week preceding June 15,1954, Mrs. Davis consulted an attorney, Mr. James E. Morford, concerning her marital troubles and about obtaining a property settlement. Mrs. Davis then advised Mr. Davis that she had retained Mr. Morford, and requested Mr. Davis to retain an attorney to negotitate a separation agreement. Mrs. Davis’ primary purpose in seeking a separation was to terminate a marital relationship which, for personal reasons, had not been successful. Mr. Davis at first declined, and refused to discuss a separation agreement or property settlement, but thereafter in the summer of 1954 retained an attorney, Mr. H. Albert Young, to represent him. At Mr. Davis’ request, Mr. Young requested Mr. Morford to make an effort to accomplish a reconciliation of the parties, but Mrs. Davis rejected the proposal after a conference with her attorney.
12. Mrs. Davis’ initial proposal for a property settlement and separation agreement was made through the respective attorneys to Mr. Davis on July 13, 1954. Mrs. Davis proposed that she would move from the home of the parties, receive one-half of the appraised value of the home and furnishings, take one automobile, receive 1,500 shares of du Pont stock, a sufficient annual payment to pay the interest on an insurance loan, have custody of the minor child, and receive $400 per month for support of the child. As a first alternative, Mrs. Davis proposed that in lieu of the 1,500 shares of du Pont stock she would accept $1,000 per month for life with the understanding that she would support the child. As a second alternative, Mrs. Davis proposed that in lieu of immediate delivery of the du Pont stock, she would accept the $1,000 per month payment until Mr. Davis’ retirement from du Pont, and then in lieu of any subsequent support payments, transfer of 1,500 shares of du Pont stock upon his retirement.
On August 24, 1954, Mr. Davis made a counterproposal through the respective attorneys to award one of the automobiles to Mrs. Davis, pay her $24,000 for one-half of the net value of the home and furnishings, pay off the $18,587.99 loan on a $50,000 insurance policy and award Mrs. Davis this policy, on condition she pay future premiums, award Mrs. Davis two unencumbered insurance policies aggregating $20,000 on the condition she assume future premium *824 payments, to create an irrevocable trust for the minor child and pay $700 per quarter for 40 quarters, or $28,000 in 10 years, into a trust estate to be disbursed by the trustee for the support and education of the minor child, and to pay $18,000 per annum for ten years in quarterly installments to Mrs. Davis for her support and maintenance, with no stock to be transferred. Mr. Davis later amended this proposal by increasing the proposed cash payment for the one-half value of the house and furnishings from $24,000 to $30,000.
These proposals and counterproposals having been successively rejected, a conference was held between Mr. and Mrs. Davis and their respective attorneys, and the parties then accomplished and executed the formal property settlement and separation agreement, dated November 4,1954, included in the Nevada decree of divorce, and hereinafter related in these findings.
13. The separation and property settlement agreement recited that various disputes and differences had arisen between the husband and wife, and that they had permanently separated. It was further recited that “the parties hereto intend by this agreement to settle their respective rights and obligations against and to one another by (1) making a division of their property; (2) providing in lieu of alimony in the event of a decree of divorce for the support and maintenance of the wife; (3) making an arrangement and provision for the support and maintenance of Stephen; and (4) defining the rights of custody, maintenance, support and education of their minor child.”
The agreement then provided a “division in settlement of their property.” Mr. Davis was awarded the home property and all furnishings and personal property thereon on condition that he pay Mrs. Davis $30,000 in cash and that Mrs. Davis have a certain automobile and certain listed items of furniture and furnishings. Mr. Davis agreed to make future transfers of a total of 1,000 shares of du Pont stock to Mrs. Davis, 500 shares on April 1, 1955, and 500 shares on April 1, 1956. Mr. Davis also agreed to deliver to his wife as owner-beneficiary, not later than February 28, 1955, the following life insurance policies, free of all *825 liens and encumbrances: the fully paid-up Dominion Life Assurance Company policy for $50,000; and the two New England Mutual Life Assurance Company policies, each for $10,000 and each having premiums fully paid to September 20, 1955. Mrs. Davis agreed to relinquish all rights to any other insurance policy.
Mr. Davis agreed to pay to Mrs. Davis “for her maintenance and support” the sum of $2,500 on December 15,1954, and $550 per month payable on the first day of each month for the ten-year period from November 1, 1954, to October 1,1964. Mrs. Davis agreed that she would accept these payment “in lieu of all claims against the husband for maintenance and support, past, present, and future.”
Mr. Davis also agreed to pay to Mrs. Davis “for her maintenance and support” a sum of money equivalent to the per-share dividend thereafter declared on du Pont stock, multiplied by the number of shares which, by the agreement of the parties, was to be transferred to Mrs. Davis in the future, but which number of shares remained untransferred at the effective date of the dividend payment.
Mrs. Davis agreed to accept “the division of property herein provided in full settlement and satisfaction of any and all claims and rights against the husband whatsoever (including but not by way of limitation, dower and all rights under the laws of testacy and intestacy), which she ever had, now has, or might ever have against the husband by reason of their relationship as husband and wife or otherwise.”
The agreement recited that Mrs. Davis would have the custody of the minor child of the parties, subject to reasonable visitation by Mr. Davis, and also provided that Mr. Davis would create an irrevocable trust, by executing an instrument in the form of that attached to the agreement, to provide “for the support, maintenance and education” of the minor child, and pay $700 per quarter-year commencing January 1,1955, for 40 quarters, or ten years, into the trust estate, to be expended by the trustee for the education and use and benefit of the minor child. The agreement also required Mr. Davis to provide a $10,000 life insurance policy for the protection of the trust estate.
*826 Both parties agreed to execute instruments necessary to carry the agreement into effect, and Mrs. Davis agreed to sign a joint Federal income tax return for 1954.
The agreement provided for a mutual release of all other debts, claims, and obligations, and also that Mrs. Davis upon the performance of Mr. Davis’ undertakings waived all claims which sh8 might otherwise have to any of the property of Mr. Davis and to any claim for support or maintenance of herself or the minor child.
The agreement further provided that in the event a decree of divorce should be granted, dissolving the marriage, the provisions of the agreement might, but need not be, incorporated into such decree, subject to the approval of the court granting such divorce.
14. Throughout the negotiations for the separation and property settlement agreement, and in property discussions prior thereto, Mr. Davis reasonably and honestly believed that immediate transfer to Mrs. Davis of 1,500 shares of du Pont stock would seriously jeopardize his chances of election and reelection as a member of the du Pont board of directors, as a member of its executive committee and as a vice president of the company. He consistently related this belief to Mrs. Davis and to their respective attorneys, and resisted transfer of any stock until and in conformity with the settlement and separation agreement of November 4, 1954. Mr. Davis believed that his associates in the top management of du Pont would understand and accept the necessity of transfer of stock in connection with the property settlement and separation agreement, but thought that it would not be acceptable to the stockholders in their election of the directors at their annual meetings.
At the time of his election to the board of directors of du Pont, Mr. Davis’ stock holdings in the company were substantially less than those of any other person nominated by the management for election to the board. In subsequent years, only two directors, both of whom were recognized scientists, held fewer du Pont shares than Mr. Davis. Mr. Davis continued to be renominated by the management and reelected by the stockholders as a member of the board despite the transfers of his shares, as shown in finding 1. During Mr. Davis’ service as a director, every person nomi *827 nated by the management of du Pont was elected by the stockholders as a director.
15. Neither Mr. Young as attorney for Mr. Davis, nor Mr. Morford as attorney for Mrs. Davis, acted for either party in connection with the suit for divorce in Nevada, except that Mr. Young by telephone engaged a Nevada law firm which independently handled the proceedings.
16. The matter of obtaining a decree of divorce or decree of legal separation was not proposed by either Mr. Davis or Mrs. Davis until November 1954. The marital difficulties had caused Mr. Davis such great discomfort and emotional upset that it had been necessary for him to be hospitalized. Mr. Davis concluded and advised Mrs. Davis that from his standpoint a divorce should be obtained. Thereafter discussions were carried on between Mrs. Davis, Mr. Morford, and Mr. Young about divorce proceedings, and the Nevada divorce suit was thereafter prosecuted by Nevada attorneys.
17. In negotiating the separation and property settlement agreement, both Mr. Young and Mr. Morford considered the federal income and gift tax consequences flowing from the various phases of the proposals made during the course of negotiations. Each attorney, however, considered such problems from the standpoint of his own client, and this same concentration for the interests of his own client was practiced by each attorney in negotiating the overall aspects of the property settlement agreement.
18. Both Mr. Young and Mr. Morford had had many years of experience as successful practicing lawyers in the State of Delaware. In the negotiations involved in this case, they advised Mr. Davis that it was the practice in conformity with Delaware law that the husband pay the attorneys’ fees of both parties in connection with negotiations for a separation and property settlement agreement. As a result of this advice, Mr. Davis understood that he had to pay the fees of Mrs. Davis’ attorney, and agreed to do so.
19. The separation and property settlement agreement contained no provisions concerning payment of attorneys’ fees. However, in accordance with the oral understanding, Mr. Davis paid to his own attorney, Mr. Young, total fees in the sum of $12,506, and total fees to Mrs. Davis’ attorney, Mr. Morford, in the sum of $10,000.
*828 On November 17, 1954, Mr. Young provided Mr. Davis with two separate bills, one for $7,506, for his services “He: Separation Agreement and Property Division between T. C. Davis and Alice M. Davis,” and the other for $5,000 for his services “Re: Tax matters in the case of Davis v. Davis.” Each of these bills showed that Mr. Davis had made a payment of $2,500 on each of them on November 16,1954, leaving respective balances of $5,006 and $2,500.
On December 16, 1954, Mr. Morford provided Mr. Davis with two separate bills, one for $5,000 “To professional services in the matter of division of property and the preparation of separation agreement between T. Crawley Davis and Alice M. Davis,” and the other for $5,000 “To professional services rendered in connection with tax matters involved in the matter of Alice M. Davis versus T. Crawley Davis.” Each of these bills showed that Mr. Davis had made a payment of $2,500 on each of them on November 14,1954, leaving a balance on each bill of $2,500.
On January 27, 1955, Mr. Davis paid his attorney, Mr. Young, the sums of $5,006 and $2,500, being the balances on the two bills submitted to him by Mr. Young.
On January 27, 1955, Mr. Davis made two payments to Mrs. Davis’ attorney, Mr. Morford, of $2,500 each, being the respective balances on the two bills submitted to him by Mr. Morford.
Mr. Morford testified in this case that he split his overall fee into two categories at the request of Mr. Davis, and that he could not possibly segregate his fee in such manner and justify the amount of one bill as against the other. He later testified that tax problems underlaid the whole relationship of the parties and that his general opinion was that the segregation of the total fee, as it was done at the request of Mr. Davis, appeared to him to be entirely reasonable. In his appearance as a witness in this case, Mr. Young’s testimony was vague and general as to the reasonableness and propriety of the division of his overall fee into the two categories, and he did not state whether the segregation was made by him independently or at the suggestion of Mr. Davis.
20. There is no testimony or evidence in this case from which it can be determined the extent to which the at- *829 tomeys’ fees paid by Mr. Davis either to Mr. Young or to Mr. Morford were reasonably allocable to the effort of Mr. Davis to retain his shares of du Pont stock and thereby to preserve his position and earning capacity with the du Pont company.
21. On March 21,1955, Mr. Davis transferred to Mrs. Davis 500 shares of du Pont common stock pursuant to the terms of the property settlement agreement.
22. On or before April 15,1956, plaintiffs filed their joint Federal income tax return for the calendar year 1955 with the District Director of Internal Eevenue for Delaware. Such return showed taxable income of $276,374.43 and net tax payable of $202,014.52. The latter amount was duly paid on or before April 15,1956.
In this 1955 return, plaintiffs claimed as a deduction legal fees in the amount of $5,000. These legal fees were the two payments of $2,500 each, one made to Mr. Young and the other to Mr. Morford, as related in finding 19, covering the respective unpaid balances on the bills of the attorneys for tax services in connection with the separation and property settlement agreement. The plaintiffs did not include as deductions the other legal fees of $5,006 paid to Mr. Young, and $2,500 paid to Mr. Morford, on January 27, 1955.
23. In connection with the audit of plaintiffs’ income tax return for 1955, the agent of the Internal Eevenue Service proposed to assess a tax deficiency in the sum of $6,318.66 on the basis of disallowance of the deduction of $5,000 for legal fees and on the basis of including in plaintiffs’ gross income a net long-term capital gain of $3,737.21, representing the difference between the tax basis to Mr. Davis of the 500 shares of du Pont stock transferred to Alice M. Davis during 1955 and the fair market value of such shares as of the date of the transfer to her.
Mr. Davis had a cost basis of $74,775.37 on the 500 shares of du Pont stock transferred to Alice M. Davis on March 21, 1955. This stock had a fair market value on that date of $82,250, or an increase in value over the cost basis of $7,474.63, one-half of which gain, or $3,737.31, was taken into account in the proposed deficiency assessment.
*830 24. On February 14, 1958, Mr. Davis paid to the District Director the amount of $6,961.95, representing the asserted deficiency for 1955 in the amount of $6,318.66 plus interest of $643.29.
25. On April 8, 1958, plaintiffs filed their claim for refund of Federal income taxes paid for 1955 in the sum of $13,642.29. This claim was based on the failure to include all of the $12,506 of legal fees paid by Mr. Davis to Mr. Young and Mr. Morford on January 27, 1955, as related in finding 19. Plaintiffs asserted in their claim that $2,500 was on that date paid to each attorney, or a total of $5,000, for legal services in connection with various Federal tax matters arising out of negotiations and execution of the separation and property settlement agreement. Plaintiffs further asserted that additional sums as legal fees, $5,006 to Mr. Young and $2,500 to Mr. Morford, were paid on January 27, 1955, for services in connection with the negotiations and execution of the same agreement, primarily incurred in connection with the protection of Mr. Davis’ position as a stockholder, officer, and director of du Pont.
This claim further asserted that the inclusion in income of the net long-term capital gain of $3,737.31 on the 500 shares of du Pont stock transferred to Alice M. Davis on March 21, 1955, was erroneous, because such transfer was pursuant to the same separation and property division agreement and did not result in any income or gain to the taxpayer.
26. By registered letter dated September 23,1958, the District Director of Internal [Revenue for Delaware notified plaintiffs of the disallowance in full of their claim for refund for the year 1955.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to rule 38(c) of the rules of this court.
*831 In accordance with, the opinion of the conrt and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on April 14,1961, that judgment for the plaintiffs be entered for $4,510.45, together with interest thereon from February 14, 1958, as provided by law.

 Grace Ethel Davis, co-plaintiff, is the present wife of Thomas Crawley Davis. A joint tax return was filed for the year 1955. For this reason she joins as plaintiff in this proceeding. Hereinafter, all references to taxpayer will refer to Thomas Crawley Davis alone.