HERBERT J. INVESTMENT CORPORATION, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 71-C-69.

United States District Court, E. D. Wisconsin.

May 24, 1973.

Foley & Lardner by James P. Brody, and Joseph R. Barnett, Milwaukee, Wis., for plaintiff.

Donald R. Anderson, Dept. of Justice, Tax Div., Washington, D. C., David J. Cannon, U. S. Atty., Milwaukee, Wis., for defendant.

## Decision and Order

MYRON L. GORDON, District Judge.

The plaintiff seeks to recover taxes and interest paid for the calendar year 1968, together with interest accrued since payment. The government has moved for summary judgment. A stipulation of facts has been filed, and affidavits have been submitted on the plaintiff's behalf.

The plaintiff, formerly known as Olson Transportation Company, had been engaged in interstate trucking. In 1968 the plaintiff negotiated the sale of its assets to CW Transport, Inc. ("CW"). Both companies were subject to Interstate Commerce Commission jurisdiction, and the sale required ICC approval pursuant to section 5 of the Interstate Commerce Act, 49 U.S.C. § 5. Section 5 of the Act allows the ICC to transfer permanent authority to engage in the business to the purchasing carrier. In addition, section 210a(b) of the Act gives the ICC power to grant the purchaser temporary authority to operate through management of the selling carrier, pending consideration of the application for permanent authority. 49 U.S.C. § 310a(b).

An agreement was executed between the plaintiff and CW on February 26, 1968. The agreement provided for the sale of specified tangible assets for a cash price based largely on the net book value of those assets as of the date of transfer of *temporary* control. The agreement also provided for the sale of certain intangible assets for 100,000 shares of CW common stock. According to the agreement, all profits and losses were to accrue solely to CW from the time of transfer of *temporary* control. Interest was to be paid to the plaintiff

from that time until final consummation of the arrangement. CW was free to select officers and directors and virtually to run the business once temporary control was approved.

On March 4, 1968, the plaintiff and CW forwarded joint applications for both temporary and permanent authority to the ICC. Temporary authority was granted on March 26, 1968, and temporary control was assumed by CW on April 1, 1968. On the latter date, CW replaced all officers and all but one director, and had a free hand in conducting the plaintiff's business, all in accordance with the agreement. An independent audit determined net book values as of April 1, 1968.

Permanent authority was later granted by the ICC, and, accordingly, title was transferred and payment with interest was made. Payment was based on the net book values fixed as of April 1, 1968, and all profits and losses from April 1, 1968, were considered by the parties to the agreement as accruing to CW.

In its federal tax return for 1968, the plaintiff reported the sale of assets to CW as completed for tax purposes on April 1, 1968, the date CW took control, and valued the 100,000 shares of CW stock received by the plaintiff as part of the purchase price at $15 per share, the April 1 value. In a deficiency letter dated August 4, 1969, the Internal Revenue Service treated the transaction as complete for tax purposes on August 30, 1968, the date of final consummation and valued the CW stock as of that date at $27.75 per share. The plaintiff subsequently paid the alleged deficiency and filed a claim for refund. Upon disallowance of the claim for refund, this action was begun.

■ The only issue presented concerns the proper date for valuation of the CW stock transferred. The determination of the plaintiff's gain under section 1001(a) of the Internal Revenue Code from the sale of its assets depends directly on the amount realized from the

sale. Internal Revenue Code of 1954, § 1001(a). The amount realized from the sale includes the fair market value of the stock received. Internal Revenue Code of 1954, § 1001(b). Thus, the significant increase in market value of the stock between April 1, 1968, the plaintiff's choice, and August 30, 1968, the defendant's, makes the proper valuation date significant.

The parties to this action agree that there is no genuine issue of material fact and that resolution by means of summary judgment is proper. I find that the defendant, the party seeking summary judgment dismissing the claim, is not entitled to prevail.

The plaintiff relinquished virtually complete dominion and control of its business to CW on April 1, 1968, following temporary approval by the ICC. CW assumed operations on that date, with all benefits and risks accruing to it. The assets exchanged were valued as of that date, and the parties contemplated their bargain on the basis of the relative worth of those assets at that time. It is apparent from the affidavits that the parties were convinced that final approval by the ICC would follow as a matter of course. Consequently, the agreement fixed their obligations and benefits as of the date of assumption of temporary control, subject only to the contingency of a failure to acquire final approval; that possibility was considered by the parties, correctly it now appears, as remote. Furthermore, even though a potential legal impediment to consummation existed, as a practical business matter the transaction was terminal for the plaintiff on April 1, 1968. On that date, its operations ceased to exist, its management and board disbanded, and its customers became CW's.

The government, however, points to provisions in the agreement which it feels are dispositive of the matter despite the intentions of the parties. The first paragraph of the agreement provides that the plaintiff "agrees to sell . . . on the consummation date hereof" its assets to CW. Paragraph 30 defines consummation date as a determinable time "within 25 days following the effective date of final orders. . . ." Paragraph 32 provides for the delivery of all instruments of conveyance on the consummation date. In essence, the government contends that the sale could not be complete until ICC approval and that this fact, as reflected in the terms of the agreement, precludes valuation of the transferred shares as of any date other than the ultimate consummation date.

I believe that the clear intentions of the parties are controlling. Certainly full approval by the ICC was, as the government contends, more than a mere formality; the purchase could not be final without it. Falwell v. United States, 69 F.Supp. 71 (W.D.Va.1946), aff'd mem., 330 U.S. 807, 67 S.Ct. 1087, 91 L. Ed. 1264 (1946). The parties recognized that fact by utilizing language which tied consummation of the arrangement with final approval. The consummation itself, however, was actually nothing more than formalization of the arrangement effected by the parties on April 1. The parties recognized the importance of final approval but were so certain of its forthcoming that they fully committed themselves to the impact of their agreement on April 1, 1968, and treated the possible failure of final approval as a real, but highly unlikely, condition subsequent.

■■ The recognition given ICC approval in the agreement should not becloud the true circumstances. A sale may be completed for tax purposes despite the existence of future contingencies. Frost Lumber Industries v. Commissioner, 128 F.2d 693 (5th Cir. 1942); Helvering v. Nibley-Mimnaugh Lumber Co., 63 App. D.C. 181, 70 F.2d 843 (1934); Wisconsin Electric Power Co., 18 T.C. 400 (1952). The time of transfer of dominion and control over assets which are the subject of a sale is a more important consideration than the time of ultimate

828

payment or conveyance of formal title. Crosby Field, 30 T.C.Mem. 961 (1971).

In addition to thwarting the intentions of the parties, adoption of the government's position would cause unfair results. The marked increase in value of the CW stock was probably attributable to CW's assumption of the plaintiff's operations. It is apparent that the transfer was considered permanent by those within the industry. The plaintiff, if not allowed to treat the transfer as effective, will be caused to suffer an immediate tax burden because that treatment was realistically afforded by others. The government's position would also preclude an entity contemplating such a sale from accurately assessing the tax consequences of its proposed actions. As stated in C.M. Hall Lamp Co. v. United States, 201 F.2d 465 (6th Cir. 1953):

> "The construction contended for by the appellee would result in a variable cost to the taxpayer, subject to subsequent developments over which it had no control, with a resulting uncertain and variable tax liability depending upon whether the market value of the stock advanced or declined in price. A taxpayer should be entitled to predetermine his tax liability in a specific legally completed transaction by a more certain and definite standard than such a variable." 201 F.2d at 468.

I believe that the same reasoning applies where, as here, the parties have bound themselves irrevocably by words and by acts, subject only to a potential occurrence which could upset the arrangement but which was not anticipated as realistically likely to happen.

Consequently, I am inclined to grant a motion by the plaintiff seeking summary judgment. If such a motion is submitted, it should be accompanied by a proposed order granting judgment on the plaintiff's claim. The proposed order should be exhibited to counsel for the defendant prior to submission.