beginning, if such a smaller obligation is determined to be "good and sufficient" in the particular circumstances.

This plaintiff, within the ten-day period, proffered a 70% bond, asserting that (a) it was unable to obtain a bond in the higher amount, and (b) that the tendered bond provided the Government with better protection than could be obtained through seizure of the dissolved corporation's assets under a judgment of the kind the court now grants. In the present posture of the case, these allegations must be accepted. If true, they seem to me to satisfy all the requirements of both the statute and Rule 26. I would therefore remand the case to the trial division to determine the accuracy of the company's assertions.*

The court suggests that this procedure would force the court "to go into the bonding business." I do not agree because I do not think that most, or even many, of the class of renegotiated contractors can make *under oath* the allegations made here—that a 100% bond is unobtainable and that better protection will be afforded the Government by the proffered bond than by execution under judgment for the amount of the renegotiation orders. To allow this contractor the opportunity to prove its case does not mean that we have to do the same for others who cannot make the same assertions under penalty of perjury.

On the other hand, the consequence of the court's ruling is that this contractor is put at the Government's mercy—the Government can execute at will on the corporate property—even though, so far as we know now, the defendant does not need in this case such unlimited and potentially destructive power in order to be protected against loss. As between some inconvenience to the court and potential injury of this stripe to a contractor, I would choose the former. Indeed, the burden of litigation is likely to be less

than we now have from contractors contesting the Government's motions for judgment in aid of execution of the renegotiation orders (where no bond or less than a 100% bond is filed).

**BANKERS TRUST COMPANY et al.**

v.

**The UNITED STATES.**

No. 89–67.

United States Court of Claims.

July 11, 1975.

---

* During the time the trial division takes to determine this issue, the Government would be protected by the 70% bond. If no bond at all is filed and the contractor litigates, as the court acknowledges he can, the defendant's

motion for judgment in aid of execution of the renegotiation orders, there is no protection at all for the Government during the period of consideration and determination of that motion.

**1212**

David W. Richmond, Washington, D. C., atty. of record for plaintiff; Robert L. Moore, II and Miller & Chevalier, Washington, D. C., of counsel.

Milan D. Karlan, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Theodore D. Peyser, Jr. and Donald H. Olson, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

OPINION

DAVIS, Judge.

This action to recover corporate income taxes assessed and paid was brought on behalf of the Mesabi Trust by its trustees, as successor to the Mesabi Iron Company. The taxes were assessed as a deficiency in the Mesabi Company's 1960 return, and all relevant events occurred prior to the July 18, 1961 change to trust status. The company rather than the trust and trustees will be referred to as "Mesabi," "the taxpayer," and "plaintiff."

The disputed tax, amounting to $3,016,132.64 plus interest, arises from a difference between plaintiff and the Internal Revenue Service as to the value of 163,570 shares of Mesabi stock received by the company during 1960 from the Reserve Mining Company. The parties' earlier motions for summary judgment were denied without prejudice and the case remanded for full development of the facts. 459 F.2d 484, 198 Ct.Cl. 306 (1972). A trial was held before Trial Judge Lloyd Fletcher who decided in favor of the Government. We now confirm that conclusion.

I

*Facts*

The events leading to the ultimate transfer of the stock, which are rather complex, are fully set out in the findings of fact made by Trial Judge Fletcher and which we adopt with minor modifications. Here we summarize only the most important steps. Mesabi Iron Company was incorporated in 1919 to mine iron ore in the Mesabi Iron Range in northern Minnesota. In consideration for the issuance of its stock, the company acquired fee ownership of a 5,700 acre tract and a leasehold interest in two other areas, one of 720 acres (Cloquet lease), and the other of 9,000 acres (Peters lease). Although Mesabi attempted to mine the leaseholds, the iron was a low grade ore called taconite and needed concentration in order to become commercially useful. Mesabi was unable to concentrate the ore on a profitable basis and suspended all mining operations in 1924.

By 1939, Mesabi was in debt by approximately $258,000 with few liquid assets. To pay its debts, but at the same time to retain the possibility of future profits from mining operations, Mesabi agreed with Reserve Mining Company, a newly formed corporation the stockholders of which were four iron and steel corporations, to lease to Reserve the

lands which Mesabi owned and to assign to that firm the two leasehold interests. In return, Reserve took over Mesabi's debts and agreed, among other things, to pay Mesabi one-third of the net profits obtained from the lands, and to "endeavor to procure the highest current price known for material of like value in use and for like quantities" in making sales and determining profits. The parties set up a two-man board of abitration to settle disputes, with a third arbitrator to be appointed if the first two disagreed.

Between 1942 and 1944, Reserve purchased through negotiation and on the open market, but with the help of Raymond B. Hindle, a stock broker who was also a director of Mesabi, 148,700 shares of Mesabi stock, or approximately 12% of the outstanding total. Starting in 1951, Reserve began to develop its Mesabi leaseholds, having devised a commercially feasible way of concentrating the taconite. This development required capital expenditures of approximately $178 million which was financed in part by Reserve's stockholders and in part by borrowing. By 1956, Reserve began producing taconite pellets, an extremely useful form of iron ore, the entire production of which was sold under a 1953 agreement to the two companies which by then had sole and equal interests in Reserve—Republic Steel Corporation and Armco Steel Corporation.

From 1953 on, Reserve issued annual reports to Mesabi in which the former stated its net profits for the year and calculated Mesabi's share. Mesabi refused to accept each of these reports, contending that the sale price of the taconite was too low in that it did not take into account the efficiencies obtained by using the uniform, concentrated pellet, that some charges by Reserve for such items as hauling the taconite on Reserve's private railroad from the mine near Babbit to the production facilities at Silver Bay were too high, and that various other charges, such as losses on in-town real estate sales in Silver Bay, should not have been assessed at all. In addition, Reserve wished to offset immediately Mesabi's part of pre-production losses against Mesabi's profit share, while Mesabi wanted to amortize these losses over a number of years.

The preproduction loss issue was settled in 1956 with an agreement to amortize the pre-1956 losses over a 13-year period, one-third falling on Mesabi and two-thirds on Reserve. The other questions were still outstanding before either a two- or a three-man board of arbitration in February 1960.

During the late 1950's the differences between Mesabi and Reserve came to a head in litigation. In 1957, several Mesabi shareholders filed a derivative action against Reserve and the then Mesabi board of directors, complaining about the failure of Mesabi to effectively prosecute its claims against Reserve. The complaint stated that Reserve was indebted to Mesabi for 1956 profits in the amount of $8,000,000. The Delaware court in which the suit was brought sequestered Reserve's stock holdings in Mesabi. In 1958, a dissident group of stockholders won a proxy fight against the old Mesabi management (Reserve voting its shares for the losing side). New management informed Mesabi shareholders that the arbitration would not lead to an acceptable agreement with Reserve in a reasonable period of time, and that Mesabi would now attempt to settle the differences in court. Reserve then filed an action in a Minnesota state court (removed at Mesabi's request to federal district court) to force Mesabi to live up to its agreement to arbitrate. Mesabi countered with counterclaims against Reserve and its stockholders, Armco and Republic, for antitrust violations in the distribution and pricing of taconite and for conspiring to interfere with the lease agreements. Mesabi also brought an antitrust action on a similar basis against Armco and Republic in the federal district court in Delaware and another suit in a Delaware state court against Reserve and Raymond Hindle, alleging a diversion of corporate opportunity in Reserve's 1940's purchases of Mesabi stock and request-

ing return of the stock. The new management also took over the position of the plaintiff stockholders in the Delaware derivative action. None of these cases was settled or completed prior to February 1960.

The alleged dollar values of the suits, according to the complaints were:

(1) $8,000,000 lost profits for 1956 in the derivative suit

(2) $16,166,667 lost profits for 1956 and 1957 in the Minnesota counterclaim

(3) $12,500,000 trebled ($37,500,000) for antitrust violations in the Minnesota counterclaim

(4) $22,500,000 trebled ($67,500,000) for antitrust violations in the Delaware federal suit

In addition, the Delaware state suit requested the return of 148,700 shares of Mesabi stock,[1] and Mesabi continued to pursue lost profit claims for 1958 and 1959 out of court. While the amounts listed above obviously overlap in some respects and are undoubtedly exaggerated, they do provide some idea of the magnitude of the claims Mesabi had outstanding against Reserve and its shareholders as of February 1960.[2]

By January 1960, the three-man board of arbitration had completed hearings on all questions except that of the propriety of Reserve's pricing of taconite pellets in its sales to its owners, Armco and Republic. On January 21, 1960, the independent arbitrator ruled that Reserve should turn over to Mesabi its records dealing with the price of taconite pellets in sales to Republic and Armco. The hearings were adjourned until March 1960.

Possibly because of this new development, the arbitration proceedings were never reconvened. Rather, Reserve initiated talks aimed at settlement of all disputes. Reserve's goal seems to have been to end all past, present, and future controversies over net profits by putting Mesabi's payments on a royalty-per-ton basis, a proposal Reserve had made several times since 1950. Mesabi was similarly anxious to get out of litigation on net profits, but only at a royalty substantially higher than that offered previously. Mesabi management was also very interested in acquiring Reserve's 12% of the outstanding Mesabi stock, in order to eliminate the threat that Reserve would vote its stock in its own interest rather than Mesabi's.

On February 18, 1960, the negotiators reached an agreement under which Mesabi would receive $400,000 and all of Reserve's stock in Mesabi (now 163,570 shares, see footnote 1, supra). Mesabi would drop all claims against Reserve, its shareholders, and Hindle, and the 1939 agreement would be modified to provide Mesabi with royalties of $1.00 per adjusted ton of taconite concentrate shipped. At Reserve's request, the agreement provided that it would not become effective until approved by a majority of Mesabi's outstanding shares but that the shares held by Reserve could not be voted nor counted toward the majority. The closing was to take place on the fifth business day following approval by Mesabi's shareholders.

On February 19, 1960, Reserve's directors and its two shareholders approved the agreement. Mesabi's directors met the same day and passed a series of approving resolutions. The only significant difference between the agreement and the resolutions was that while the former indicated that the stock and cash would both be exchanged for the pre-1960 profits claims and those claims only (not for the antitrust claims), the resolutions provided that the cash would be tied to the claims relating to

---

1. The number of shares held by Reserve was increased to 163,570 as a result of a 1959 "stock dividend." It was later discovered that Mesabi did not have sufficient surplus to issue a legal dividend, and the transaction was relabeled a "stock split" and so entered on Mesabi's books.

2. Not included in the listing is the almost $10,000,000 lost-profits claim for the years 1956–1958 which Mesabi was pursuing in arbitration. See Finding of Fact 29.

pre-production losses, the profits claim, and the lease modification, that all suits against Reserve would be dismissed by Mesabi with prejudice, and that Mesabi would receive Reserve's shares. The minutes of that meeting, and testimony taken at trial, indicate that Mesabi's directors were concerned whether the agreement was a fair exchange and also about its tax consequences, and the company's counsel, Mr. Lester Tanner, advised them on these matters.

While the minutes do not so show, Mr. Tanner testified that he had advised the board that the stock and cash together, using the closing price of the stock on the American Stock Exchange on February 18,—40⅝, were worth approximately $7,000,000 and that this amount was about all Mesabi could expect to obtain from its pending claims. Mr. Tanner also advised, according to this trial testimony, that Mesabi's tax liability from the settlement would be a maximum of $7,000,000 of ordinary income, but that it was possible that the exchange could be viewed as a tax-free redemption or an exchange of capital assets.[3]

On February 20, Mesabi issued a press release and shareholder's letter stating that a settlement had been reached, subject to shareholder approval, and briefly outlining the details of the agreement. The release and letter, although not the agreement itself, also stated that the shares received would not be reissued. The formal settlement agreement, which tracked the draft agreement rather than the resolutions and was dated February 19, 1960, was signed by Mesabi's president on February 28, and by Reserve's

on March 2. Between February 18 and March 2, the closing price of Mesabi stock on the American Stock Exchange rose from 40⅝ to 60⅝. On March 21, 1960, Mesabi sent its stockholders a proxy statement (dated March 18) for the April 22 shareholder's meeting at which there would be a vote on the settlement agreement. The proxy statement did not attempt to put any value on the shares to be received from Reserve. It also did not indicate that the stock was to be received only in exchange for the royalty claims. On March 22 and 23, it was reported in the press that Mesabi was considering changing from corporate to trust form to avoid double taxation of its profits if the settlement agreement were approved. On April 7, Reserve announced its intention to expand production, which would, of course, increase Mesabi's royalties.

During this entire period, various brokerage houses were advising customers to buy Mesabi stock as a good income investment and also for possible capital gain. Presumably because of the settlement and related activities, trading in Mesabi stock increased substantially in volume from February 18 on. For example, 24,600 shares were traded in January, 145,100 in February, and 172,700 in March. In addition, the price began a lengthy and substantial climb from 40⅝ on February 18, 1960 to over 90 by the end of 1960. On April 21, the day before the Mesabi shareholders' meeting, the stock closed at 82¾, and the mean sales price on April 22 was 78¼.

At the April 22 shareholders' meeting, the agreement was approved by a vote of 1,016,049 shares to 970 shares, far in

---

**3.** While Mr. Tanner likewise testified that Mesabi was deeply concerned about the extent of its tax liability and would not have wanted a more lucrative settlement because the company was cash-poor, we hesitate to accept this observation since this concern is nowhere noted in the minutes of the meeting, and Mesabi paid its shareholders a cash dividend of $3.00 per share, or a total of $3,579,672, in November 1960—after the settlement and before the 1960 taxes were due. The dividend was, in fact, paid over the objection of plaintiff Haas that the cash would be needed for tax pur-

poses. Furthermore, Mesabi floated an issue of 119,322 shares of stock at $60.00 a share in early 1961, which it evidently had no difficulty selling to its shareholders through a rights offering (the stock was priced on the market at approximately $120 when the rights were issued). The prospectus for the rights offering stated that the shares were being sold to create a cash reserve to pay taxes which might be due because of the settlement if the Mesabi shares received were valued at a price higher than 40⅜.

excess of the 661,898 shares needed to ratify. Approximately 87% of the shares eligible to vote were voted. By April 27, when the closing took place, all of Mesabi's litigation with Reserve, Republic and Armco had been terminated. Mesabi received Reserve's shares, the $400,000 provided by the settlement agreement, and $1,464,960.05 as a royalty payment for the first quarter of 1960. The shares were received free and clear of all claims, liens, or encumbrances, since the sequestration orders covering them had been lifted at Mesabi's request on April 25. The mean price for which Mesabi stock was selling on the American Stock Exchange on April 27 was 73¼.

In its 1960 income tax return, plaintiff acknowledged that it had received income through the settlement agreement, declaring the shares to have been worth $5,908,966.25—163,570 shares at $40.375 each (the February 18, 1960 closing price on the American Stock Exchange) less a "blockage" discount of $4.25 per share. The Internal Revenue Service, on the other hand, took the position that the proper value of the stock was its value on April 22, 1960 (when the shareholders approved the settlement agreement), that that value is best evidenced by the mean trading price on the American Stock Exchange that day, i. e., $78.25, and that plaintiff had not shown itself entitled to any blockage discount. Defendant therefore priced the stock at $12,799,352.50. The disputed tax is a result of this difference in valuation, with credits for increased state royalty taxes and for increased depletion deductions if the higher figure is taken into account.

The controversy in this court centers on whether (1) the value of the stock for tax purposes was its worth as of February 18, 1960, the date on which negotiators for Mesabi and Reserve reached their agreement, or April 22, 1960, the day on which the Mesabi shareholders gave their approval; and (2) if the April 22 date is chosen, the value of the stock

on that date. Plaintiff contends that the value as of February 18, 1960 is the proper figure but that even if April 22 is the crucial date, the correct April 22 value of the block of shares was no more than its February 18 value.[4]

## II

### Valuation Date

Plaintiff insists that this is not an "accounting" case, since there is no issue as to *when* the value of the shares was to be taken into income; Mesabi was on the accrual basis and taxpayer agrees that the taking-into-income date was April 22, 1960, when the Mesabi-Reserve agreement became final and binding through the vote of Mesabi's stockholders. But, says plaintiff, the valuation date need not be the same as the taking-into-income date; in this instance it should be February 18, 1960, when the parties made their bargain and (it is said) fixed a firm value for the shares to be transferred.

Our difficulty with this approach is that it runs counter to the basic principle that under the federal income tax system items are taken into income at their then current value. The Code's provision for different accounting methods, and related regulations, do not directly tell us this but they do so by implication, and this has been the consistent course of judicial and administrative treatment under the income tax. *See* Treas.Reg. §§ 1.61–2(d)(4), 1.451–1(a), 1.61–2(d)(2)(i). It is this proposition which, for example, creates the need to undertake the difficult task of determining the present value of future interests. *See* Treas.Reg. § 1.1001–1(a); Rev.Rul. 58–402, 1958–2 C.B. 15; *Grill v. United States*, 303 F.2d 922, 925–26, 157 Ct.Cl. 804, 809–11 (1962). *Compare Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931) (rights to future receipts presently incapable of valuation need not be included in income until re-

---

4. Plaintiff's petition originally claimed in the alternative that the shares were received in a tax-free redemption or in exchange for a capi-

tal asset. Both theories have been discarded by stipulation and are not before us.

ceived). When income is received, be it on the day the right to receive becomes fixed, as with an accrual basis taxpayer, or when beneficial ownership commences for a cash basis taxpayer, the amount of income received becomes set at its then value. *See Fordyce v. Helvering*, 64 U.S.App.D.C. 181, 76 F.2d 431, 434–35 (1935); *C. M. Hall Lamp Co. v. United States*, 201 F.2d 465, 468 (C.A. 6, 1953); *Hoffer v. Comm'r*, 24 B.T.A. 22, 27 (1931). Parties cannot arbitrarily decide that they are dealing, for instance, in deflated 1933 dollars when cash is received. While an exchange of property is more complex in that the current value of the item received may not be self-evident, the same principle applies.

Plaintiff cites two recent cases which it claims support its point that an item, particularly stock, need not be taken into income at its value on the date on which it is includable in income. *White Farm Equipment Co. v. Commissioner of Internal Revenue*, 61 T.C. 189 (1973), *rev'd sub nom., Amerada Hess Corp. v. Comm'r*, 517 F.2d 75 (C.A. 3, 1975),[5] while relevant on the subject of valuation, does not at all sustain taxpayer on the date-of-valuation issue. In *White Farm*, the court clearly viewed the proper valuation date as October 31, 1960, the day on which shareholders of both companies approved the agreement, and felt called upon to determine the proper value of the stock received as of that date. 61 T.C. at 214–15; 517 F.2d at 83 n. 29. Whatever the correctness of the court's determination of the value as of October 31, 1960, that was plainly chosen as the valuation date.

The other case is *Herbert J. Investment Corp. v. United States*, 360 F.Supp. 825 (E.D.Wis.1973), *aff'd per curiam*, 500 F.2d 44 (C.A. 7, 1974), in which plaintiff trucking company sold all its assets to a second company, CW Transport, Inc., in return for cash and stock in CW. The agreement, which was subject to approval by the I.C.C., provided that CW would take control of the assets and the assets would be appraised to set a firm sales price as soon as possible after temporary approval of the I.C.C. was received, but that title would not actually pass in either direction until the I.C.C. granted permanent authority. Following I.C.C. temporary approval on March 26, 1968, CW, on April 1, took over all plaintiff's assets and customers, and replaced all officers and all but one director. By agreement, all profits and losses of the business after April 1 were CW's, and plaintiff received interest on the purchase price—the value of the assets as of April 1—from that date until final settlement. I.C.C. permanent approval followed, and the agreement was formally closed on August 30. The market price of CW stock had increased substantially between April 1 and August 30, and after plaintiff valued the shares as of the earlier date, the Service assessed a deficiency, claiming that the later time was proper for valuation. The District Court found that, while I.C.C. approval was not a mere formality, it was so likely that everyone—the stock market, the industry, and most important the parties—treated the transfer as completed on April 1. In those circumstances, the court found that equity compelled a finding that the shares had been effectively transferred on April 1, and the value on that date should control.

The critical difference between *Herbert J. Investment* and the present case is that in the former the parties did not wait for final ICC approval to close the transaction but effectively closed it as of April 1st and deemed it permanent as of that time. As the District Court pointed out (360 F.Supp. at 827–28), the "consummation itself [after final ICC approval], however, was actually nothing more than formalization of the arrangement effected by the parties on April 1," and the parties "fully committed themselves to the impact of their agreement on April 1, 1968, and treated the possible

---

**5.** The Third Circuit decision in *White Farm,* which reaches a result similar to that we reach, issued subsequent to the preparation of this opinion. While that decision supports our reasoning, we have reached our conclusion independently.

failure of final approval as a real, but highly unlikely condition subsequent. * * * The time of transfer of dominion and control over assets which are the subject of a sale is a more important consideration than the time of ultimate payment or conveyance of formal title."

■ Here, on the other hand, no effort was made to close in any way before the vote of the Mesabi stockholders on April 22, nor was it ever contemplated that the actual closing could or would precede that event. The parties were very careful not to disturb the main bargaining counters each had—the lawsuits—until after shareholder approval. The agreement's provision that closing would be delayed for five days after approval was related to this decision. No stock or money changed hands before April 22. Reserve's plans for expansion, though announced between the signing of the agreement and the Mesabi stockholders' meeting, stated that expansion would be undertaken "[i]f the settlement is made as contemplated, * * *" (emphasis added). The shareholders' approval was treated throughout as a most significant condition precedent, not as a condition subsequent as in *Herbert J. Investment*. In short, while the present parties could have presented us with a case like that one, they have not.

We add that here stockholder approval, though probable, was surely not a mere formality. Mesabi stockholders had not been a docile group, as the 1958 proxy fight showed, and major blocks of shares were still in the hands of persons associated with old management. Furthermore, Mesabi had, on the record date for the vote, over 2700 individual and 250 institutional shareholders. Most of the shareholders had fewer than 100 shares, and no individual shareholder owned more than 37,154 shares directly. Since Mesabi had agreed to an absolute majority vote, non-voting shares were in effect voted against the agreement. While Mesabi's board of directors might have been convinced that those who voted would vote for the agreement, the failure, through disinterest or inadvert-

ence, of small shareholders to vote could have prevented ratification and must be considered a risk to final approval of the agreement. In fact, the agreement received the vote of only 87% of the eligible shares, not the 99.9% plaintiff has claimed.

Plaintiff has argued that acceptance of the accrual date as the valuation date leaves the parties unable to determine in advance the tax consequences of a transaction in which actively traded stock is exchanged. The point fails to recognize that the participants could agree on a purchase price and provide that it would be paid in "x" shares of stock at the market price on the final date of agreement plus or minus a cash balancer. There is no reason to believe that this formula was considered and rejected in this instance as infeasible. As the evidence and particularly the testimony of Mr. Jesse Climenko, plaintiff's counsel at the time, shows, Mesabi was not particularly interested in how many dollars it was receiving (beyond a certain minimal amount) but in ending Reserve's interest in Mesabi and in modifying the lease agreement. (Climenko, Tr. at 109–110.) Plaintiff, while it had concern for the tax consequences, had other thoughts uppermost in its corporate mind in February 1960, and should not be heard now to complain that, if it had wanted to, it could not effectively have arranged the transaction so as to predetermine the tax consequences.

■ Nor is it an adequate answer to say that the Treasury would not be harmed by allowing the parties to fix the value of transferred property at a time prior to and lower than the date-of-taking-into-income since a decrease in one side's tax (as here)[6] would be counterbalanced by an equivalent increase in the tax owed by the other side. That is not always true even if the Service manages to keep both taxpayers before it at the same time; the theoretical increase in tax for the one party may be washed out, in actual fact, by its own special circumstances. And in any event it would be a considerable administrative

---

6. If the value of the property had increased by the time of taking into income.

burden on the Service to ensure that in all such instances it kept the cases of the two (or several) taxpayers always in tandem so as to be able to collect, on balance, a tax based on the property's value at the date-of-taking-into-income. The general rule is that while the parties may be normally bound by the value agreed upon between them, the Service is not so restricted. *Commissioner v. Danielson*, 378 F.2d 771, 774–75 (C.A. 3), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967); *see Eckstein v. United States*, 452 F.2d 1036, 1042, 196 Ct.Cl. 644, 655 (1971).

## III

### *Value as of April 22, 1960*

■ Our decision that the stock received must be valued at its April 22, 1960 value does not decide what that value was. The starting place for discussions of value is of course the proposition that the "fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts." *Jack Daniel Distillery v. United States*, 379 F.2d 569, 574, 180 Ct.Cl. 308, 315–16 (1967). Where stock is freely traded in an open, organized market, stock exchange quotations for the valuation date generally provide the best evidence of value.[7] *See Moore-McCormack Lines, Inc. v. Comm'r*, 44 T.C. 745, 759 (1965); *Southern Natural Gas Co. v. United States*, 412 F.2d 1222, 1252, 188 Ct.Cl. 302, 351–52 (1969); 10 J. Mertens, The Law of Federal Income Taxation §§ 59.13 at 42–43, 59.14 at 47 (1970). However, extraordinary circumstances relating either to the state of the market or to the shares actually being valued can make market quotations unreliable

indicators of true value. *Taylor v. United States*, 33 AFTR 2d 74–1317, 1320 (E.D.N.C.1974). Several possible factors have been discussed in this regard and plaintiff has, at various points in the proceeding, suggested that some may be applicable.

■ A. Primarily, plaintiff says that the shares should be valued by the "barter-equation method" in which the value of an item received in an arms-length transaction is taken as equal to the value of the item given up. Under this theory the value which intelligent, knowledgeable parties with adverse interests put on an item should be regarded as the fair market value of that item, given the circumstances of the trade, since there usually is no other trade available for comparison which is identical in all respects. While the thought has some appeal, in all the cases we have been able to find in which it was used, the objective market price suffered from some deficiency not present here. *See, e. g., Moore-McCormack Lines, supra* (market too "thin" to absorb shares; shares carried "a bundle of collateral rights"); *Southern Natural Gas, supra* (no recent sales of closely held stock). In the present instance, there is no comparable reason for rejecting the active trading price on the exchange on April 22; if plaintiff had chosen to reissue the shares at that time it would have gotten that price (as we show *infra*).

We also find that plaintiff's position suffers from the fatal flaw that there was no clear agreement between the parties on the value of what was being exchanged. *See KFOX Inc. v. United States*, 510 F.2d 1365, 1370–71, 206 Ct.Cl. —— (1975); *Bar L Ranch Inc. v. Phinney*, 426 F.2d 995, 1001 (C.A. 5, 1970). Unlike *Southern Natural Gas and Moore-McCormack, supra,* no value for

---

7. Plaintiff has not questioned defendant's use of the mean between the high and low price at which the shares traded on April 22 as a valid measure of the stock market price on that date, even though the calculation is found in the estate, rather than income tax, regulations. Treas.Reg. § 20.2031–2(b). Defendant's prac-

tice has been accepted as valid by the Tax Court in income tax proceedings, and, in the absence of any complaint by plaintiff, we are inclined to follow. *See Meyer v. Comm'r*, 46 T.C. 65, 106 (1966), *modified on other grounds*, 383 F.2d 883 (C.A. 8, 1967).

the stock or for the items (release of claims) given in return was stated in the agreement. Nor did the agreement on its face tie the value of the shares to the then stock exchange price. There is absolutely no evidence in the record about what Reserve thought was the value of what it was receiving. There is no indication in the minutes of the February 19 Mesabi directors' meeting (although there is in Mr. Tanner's notes prepared for that meeting) that there was discussion of the $7,000,000 figure for the total value received. Similarly, the proxy statement is silent in this regard. And the validity of the $7,000,000 figure is certainly open to question in light of the fact that it includes only the pre-1960 royalty claims while, no matter how the agreement was in fact drafted, Mesabi was actually giving up its right to pursue its antitrust cases, and its claims for the premium value of the taconite pellets, claims which together exceeded $50,000,000. In addition, Mesabi received more than stock and money—it received the right to definite and certain royalty payments in a clearly determinable amount—a right which it had not had before and which was, in fact, a major objective of the bargain.

■ Even if plaintiff were to overcome this significant hurdle of lack of a clear agreement on value, the "barter-equation method" should not be used. As the Second Circuit noted in a similar case, that method

> is a means which should be used only under certain limited conditions. The authority for it comes almost exclusively from cases involving valuation of property for which there is little or no market; * * * There are obvious dangers in evaluating the consideration involved in one side of a barter by determining the worth of the consideration on the other side. In the first place, the two sides of the barter may, for various reasons, not be equal in value. Secondly, the barter-equation method is in the nature of a bootstrap operation since there is usually no logical reason to start with one side

rather than the other. * * * Thirdly, the evidence on the value of one side of a barter may be no more reliable than that on the value of the other side.

*Seas Shipping Co. v. Comm'r,* 371 F.2d 528, 529–30 (C.A. 2), *cert. denied,* 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967). All the problems highlighted by that court are present here.

First, there is the distinct possibility that the two sides of the barter were not equal in monetary value. According to the testimony of Mr. Climenko, Mesabi was most interested in two things: getting rid of Reserve's power over Mesabi by eliminating Reserve's stock ownership, and revising the lease agreement to give Mesabi an easily determinable royalty. The number of shares which Mesabi wanted to receive from Reserve was clear—all of them. What value each share had was, while not irrelevant, relatively unimportant, as was the total value. As one commentator has noted, "[W]hen shares are repurchased by a corporation from a dissenting stockholder, perhaps to get rid of him at any price [, the] stockholder might have been paid far more than his stock was worth, part of the payment actually representing nuisance value." Holzman, *When actual sales may not establish fair market value for securities,* 29 J.Tax 134, 135 (1968). Here, as there, the important objective was to separate the other side from the shares, not to get a price equivalent to the things given up by Mesabi.

Second, plaintiff has not supplied us with a good reason why we should value the stock by the claims rather than the other way around. This is not a situation where an independant appraisal of the value of the claims was available, so that doubts about the wisdom of using April 22 market quotations as the value of the stock could be resolved by reference to an independent estimate of the value of what Mesabi was giving up. And third, the value of what was exchanged for the stock here is, if anything, even more speculative than the value of the stock. In addition to the

problem of determining exactly what was given up, plaintiff has produced testimony on the speculative nature of some of its claims, and has shown that even the value of the pre-1960 profit share claims is difficult to determine. There is, for example, no cogent evidence in the record of the exact value of the 1959 claim—all we know is that Reserve thought Mesabi entitled to $661,-469, and that Mesabi thought "maybe we would have gotten $1,500,000, somewhere in that area" (Tanner, Tr. at 51). In the major case on the subject, *United States v. Davis*, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), the Court made no attempt to even try to determine directly the value of what the taxpayer had received (release of marital rights), but evaluated those rights by reference to the more easily ascertained value of the stock the plaintiff had given up. We think a similar solution is applicable here.

■ B. Restricted stock will frequently have a lower value than that traded on the exchange since it is by definition less marketable (*see, e. g., Heiner v. Crosby*, 24 F.2d 191, 193 (C.A. 3, 1928)), but there is no ground for reducing the value of the shares at issue simply because they were originally subject to the Delaware sequestration orders. The settlement agreement provided that the actions under which the shares were sequestered would be dismissed "at or prior to closing" and the sequestration order in the *Mesabi v. Reserve and Hindle* case (the only order in evidence) provided that upon dismissal of the action the shares would be released from sequestration. Furthermore, that same order provided that, on Reserve's direction, the stock could at any time be sold upon provision of equal security. Presumably, this provision would include a sale to Mesabi. In any event, the shares received were released from sequestration on April 25 and were received free and clear. Since the likelihood of the shares being obtained by Mesabi in restricted status was, by the terms of the settlement agreement, ex-

tremely small, we conclude that no deduction in the market price should be made on this account.

■ C. A corollary of the point just discussed is plaintiff's claim that the shares should be valued at a price other than the April 22d market price because they were not to be resold. But taxpayer had not entered into any binding agreement with anyone, including Reserve, to that effect. The cases cited are distinguishable in that there the parties exchanging the shares had agreed that the stock would not be resold or could be resold only under restrictive conditions. *See White Farm Equipment Co., supra*, 61 T.C. at 201–02 (stock to be distributed to recipient's shareholders or sold in a public offering with no order for more than 10,000 shares filled); *Seas Shipping Co. v. Comm'r*, 24 CCH Tax Ct. Memo 1222, 1226 (1965), *aff'd*, 371 F.2d 528 (C.A. 2, 1967), *cert. denied*, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967) (shares to be held for investment and not resold). Moreover, plaintiff's action in early 1961 of floating a stock issue almost as large as the number of shares received from Reserve suggests that the plan to retire the shares permanently was not, in fact, fully realized.

■ D. Another point is that the market prices either should be discarded completely or discounted because they are not reflective of the price at which the extremely large block of stock involved here would have sold, a phenomenon known as "blockage." *See Treas. Reg.* § 20.2031–2(e). We note first that plaintiff has not objected to the trial judge's refusal, by implication, to find it entitled to a blockage discount. Our own analysis leads us to the same conclusion. While a large block of shares dumped on the market at one moment will ordinarily depress the market price for a time, *Seas Shipping Co. v. Comm'r, supra* 371 F.2d at 530, the courts which have considered the blockage issue have concluded that the problem should be treated in terms of whether the market could have absorbed the shares within a

reasonable period of time. *Richardson v. Comm'r,* 151 F.2d 102 (C.A. 2, 1945), *cert. denied,* 326 U.S. 796, 66 S.Ct. 490, 90 L.Ed. 485 (1946); *White Farm Equipment Co., supra,* 61 T.C. at 215. In those cases in which either a blockage discount has been allowed or the market price disregarded entirely because too large a block was involved, the number of shares being valued was very much greater than the total shares traded in a year. *See, e. g., Amerada Hess Corp., supra,* 517 F.2d at 89, 91 (665,000 shares being valued; 444,000 traded during entire year); *Moore-McCormack Lines, Inc., supra,* 44 T.C. at 760 (300,000 shares being valued; 166,000 traded during entire year). In the present case, the record shows that the number of shares to be valued is smaller than that traded during the single month of March 1960. In the absence of any evidence from plaintiff to the contrary, we conclude that with this type of active market the shares could have been absorbed fast enough for a blockage discount to be inapplicable, and that the number of shares involved is not so large as to make the market prices inherently suspect.[8]

E. Plaintiff's final argument is one initially broached from the bench at oral argument on the earlier cross-motions for partial summary judgment. It was suggested then that, on analogy to condemnation cases, if plaintiff could prove that the increase in the value of the shares was a result of the settlement agreement, the fair market value for tax purposes might be considered the "pre-action" value, the worth as of February 18. Further reflection, aided by the presentations of the parties, has convinced us that the analogy is inapposite.

The Supreme Court has stated that in determining the amount due the owner of condemned property under the just compensation clause, "[it] is not fair that

the government be required to pay the enhanced price which its demand alone had created. That enhancement reflects elements of the value that was created by the urgency of its need for the article. It does not reflect what 'a willing buyer would pay in cash to a willing seller,' in a fair market. * * * [T]he enhanced value reflects speculation as to what the government can be compelled to pay. * * * That is a value which the government itself created and hence in fairness should not be required to pay [citations omitted]." *United States v. Cors,* 337 U.S. 325, 333–34, 69 S.Ct. 1086, 1091, 93 L.Ed. 1392 (1949); *see United States v. Miller,* 317 U.S. 369, 375, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

■ This rule excluding such "enhancement" has been limited, so far as we are aware, to condemnation cases, and there are several reasons why it should not be extended in plaintiff's favor. First of all, if the value of the shares was enhanced here because of the settlement agreement, that was due to the actions of both Mesabi (buyer) and Reserve (seller), and not that of the buyer alone; the increase was not attributable, as in the condemnation cases, to the buyer's special need for the property which itself pushed the price upwards. Second, it has not been proven what part of the increase was due to the settlement agreement and what part to Reserve's collateral but separate plan to increase production and to Mesabi's change-over from the corporate to the trust form. Third, Mesabi could, as we have discussed above, have resold the stock at its enhanced value and reaped the benefits of the enhancement. In a condemnation proceeding, on the other hand, the assumption is that, but for the condemnor's desire to acquire, the property could not have fetched the premium value claimed for it. If it were not for the "enhancement-exclusion" rule, the

---

8. While defendant did not assess the shares at a value exceeding the market price, the fact that the block had substantial nuisance value and might in fact have been controlling if Reserve had pressed its position, tends to indicate that the shares might have had a premium rather than a depressed value. *See* 10 J. Mertens, The Law of Federal Income Taxation § 59.15 at 53 (1970); Treas.Reg. § 20.2031–2(e).

public authority would have to pay an extra sum, attributable to its announced need, which it would be unlikely to recoup or obtain any value for. The principle is one of fairness to the condemnor and at the same time to the condemnee. Finally, we note that Mesabi was the recipient of the higher-value shares without being required to pay more than had been agreed on February 19, 1960, for those shares. This is the result the non-enhancement principle yields in the condemnation cases, and there is no need to tack on extra benefits to the buyer by taxing him at the lower value though he received and could take advantage of the higher.

██ Our conclusion, then, is that plaintiff has not produced any adequate reasons why we should disturb the defendant's determination that the traditional basis for valuation of widely-held stock should be used. We hold that the value of the stock Mesabi received was, on April 22, 1960, the mean of the high and low prices at which the stock was sold on the American Stock Exchange on that day, $78¼.

The taxpayer is not entitled to recover and the petition is dismissed.

KASHIWA, Judge (dissenting):

I respectfully dissent from the majority for the reasons hereinafter stated.

26 U.S.C. § 1001(b) (1970) provides, as pertinent herein, that the "amount realized from the sale or other disposition of property shall be the sum of any money received plus the *fair market value of the property* (other than money) received." [Emphasis supplied.] Under this basic section, the present case turns out to be a simple stock valuation case.

There is no dispute in this case as to when income was to be reported so we are not concerned with the date on which all the events had occurred which would require Mesabi to accrue the value of the stock as income.[1] Our sole concern is the "market value" of the stock.

In *Jack Daniel Distillery v. United States,* 379 F.2d 569, 574, 180 Ct.Cl. 308, 315–316 (1967), we stated that:

> * * * The legal definition of fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts. *Wood v. United States,* 29 F.Supp. 853, 89 Ct.Cl. 442 (1939). [Footnote omitted.]

This definition is identical to that in *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). See, also, *White Farm Equipment Co. v. Commissioner,* 517 F.2d 75 (3rd Cir., May 13, 1975),[2] *rev'g,* 61 T.C. 189 (1973), where the same *Cartwright* decision of the Supreme Court is referred to and the decision of the Third Circuit is based on this fundamental principle.

The majority properly finds in its opinion portion of the decision (as distinguished from the findings of fact) that plaintiff and Reserve entered into an agreement:

> On February 18, 1960, the negotiators reached an agreement under which Mesabi would receive $400,000 and all of Reserve's stock in Mesabi (now 163,570 shares, *see* footnote 1, *supra*). Mesabi would drop all claims

---

**1.** Treas.Reg. § 1.451–1(a) (1960) which states in pertinent part:

"* * * Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * *" This regulation is issued under Int.Rev.Code of 1954, § 451 entitled "General Rule for Taxable Year of Inclusion." The focus under § 451 is only upon

when income is to be reported. Section 451 is simply an accounting standard used to determine the year in which income is to be reported. The majority seems more concerned with this accounting standard than with what 26 U.S.C. § 1001(b) (1970) above quoted basically provides.

**2.** Consolidated with *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75.

against Reserve, its shareholders, and Hindle, and the 1939 agreement would be modified to provide Mesabi with royalties of $1.00 per adjusted ton of taconite concentrate shipped. At Reserve's request, the agreement provided that it would not become effective until approved by a majority of Mesabi's outstanding shares but that the shares held by Reserve could not be voted nor counted toward the majority. The closing was to take place on the fifth business day following approval by Mesabi's shareholders.

It is important to note the majority also found specifically in its findings-of-fact portion of the decision that a price of $40⅜ per share was "considered by the taxpayers' board of directors at their February 19, 1960 meeting" (Findings ¶ 52) when they considered and approved the settlement (Findings ¶¶ 32, 35). The majority further found that at that meeting the board of directors was advised by counsel "that $7,000,000 was the maximum amount that reasonably could be expected for [Mesabi's] pre-1960 claims" (Findings ¶ 35) and that in satisfaction of those claims Mesabi was receiving $400,000 cash plus Mesabi stock worth $6,600,000 being the 163,570 shares of Mesabi stock at $40⅜ per share, thereby realizing what was essentially a complete victory with respect to its pre-1960 net profits claims (Findings ¶ 35). These findings are recited here because the majority after making these findings should not overlook the rest of the record in this case.

An examination of the entire record in this case shows that the evidence is clear, compelling, conclusive, and uncontradicted that the 163,570 Mesabi shares were valued on a $40 per share basis. There are 142 pages of uncontradicted testimony by witnesses Lester J. Tanner and Jesse Climenko in the record which clearly prove this. Furthermore, the fact that $40 was used as the per share value is supported not only by parol evidence but by documentary evidence received in evidence at the trial, plaintiff's Exhibit B. Added thereto, witness Lester

J. Tanner explained in connection with Exhibit 58 the $7,000,000 settlement figure. Up until 1956 Reserve incurred operating losses which it claimed to be $18,421,844.23. Mesabi claimed they were $15,314,582.19. The losses had to be recovered from profits before Mesabi could get its one-third share. An agreement was made whereby the losses would be amortized over a 13-year period so that if every year there were profits over and above one-thirteenth of the pre-production losses, Mesabi would get royalties. An amortization of $15,314,-582.19 at one-thirteenth a year for 1956, 1957, and 1958 would leave $11,780,447.85 in unamortized losses. Therefore, one-third would have to be deducted from the balance due Mesabi: $9,808,542.70–$3,926,815.95 = $5,881,726.75. To this, add the claim for 1959 of approximately $1,500,000, resulting in a total of $7,381,-726.75. This conclusively shows that $7,000,000 was the settlement figure based on concrete figures.

In view of the clear record in this case above pointed out, it is difficult to depart from the conclusion that the parties intended the transaction to be $400,-000 plus 163,570 shares at $40⅜ for claims worth about $7,000,000. The arithmetic below cannot be denied:

163,570 shares at $40⅜ = $6,604,138.75
Cash paid = 400,000.00
_____
$7,004,138.75

This arithmetic is not a pure coincidence because $40⅜ was the market price of Mesabi shares on February 19. Where the evidence is undisputed and the results are supported by plain arithmetic, there was only one conclusion the majority could have reached—the agreement and bargain of the parties necessarily included the value of $40⅜ per share.

Under any written contract, consideration if not recited in the contract may be proven by parol evidence. *Bernatschke v. United States,* 364 F.2d 400, 404–405, 176 Ct.Cl. 1234, 1239–40 (1966); *Paccon, Inc. v. United States,* 399 F.2d 162, note 11, 185 Ct.Cl. 24, note 11 (1968). Although the value of the 163,570 Mesabi

shares was not recited, it was proven by parol evidence. The trial judge allowed 147 pages of testimony to prove that the shares were valued at $40 per share, the February 19 value. Documentary evidence was also allowed to fully corroborate the parol proof. Such proof uncontradicted is equivalent to a full recital of the consideration in the contract.

In tax cases where parties to a contract agree to a price, courts will let the contract price stand. This is a rule of much significance because the Supreme Court in *United States v. Davis,* 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), used the above-mentioned rule to partially reverse a prior opinion of this court. *Davis v. United States,* 287 F.2d 168, 152 Ct.Cl. 805 (1961). The Court stated 370 U.S. at 72–73, 82 S.Ct. at 1194:

> It must be assumed, we think, that the parties acted at arm's length and that they judged the marital rights to be equal in value to the property for which they were exchanged. *There was no evidence to the contrary here.* Absent a readily ascertainable value it is accepted practice where property is exchanged to hold, as did the Court of Claims in *Philadelphia Park Amusement Co. v. United States,* 126 F.Supp. 184, 189, 130 Ct.Cl. 166, 172 (1954), that the values "of the two properties exchanged in an arms-length transaction are either equal in fact or are presumed to be equal." Accord, *United States v. General Shoe Corp.,* 282 F.2d 9 (C.A. 6th Cir. 1960); *International Freighting Corp. v. Commissioner,* 135 F.2d 310 (C.A. 2d Cir. 1943). To be sure there is much to be said of the argument that such an assumption is weakened by the emotion, tension and practical necessities involved in divorce negotiations and the property settlements arising therefrom. However, once it is recognized that the transfer was a taxable event, it is more consistent with the general purpose and scheme of the taxing statutes to make a rough approximation of the gain realized thereby than to ignore altogether its tax consequences. Cf.

*Helvering v. Safe Deposit & Trust Co.,* 316 U.S. 56, 67, 62 S.Ct. 925, 930, 86 L.Ed. 1266 (1942). [Emphasis supplied.]

The rule has since been followed by this court. See *Davee v. United States,* 444 F.2d 557, 195 Ct.Cl. 184 (1971); *Republic Steel Corp. v. United States,* 40 F.Supp. 1017, 94 Ct.Cl. 476 (1941); *Annabelle Candy Co. v. Commissioner,* 314 F.2d 1 (9th Cir. 1962); *Ullman v. Commissioner,* 264 F.2d 305 (2d Cir. 1959). And more recently, this court stated in *KFOX, Inc. v. United States,* 510 F.2d 1365, at p. 1370 (Ct.Cl., 1975):

> When two parties to the sale of assets explicitly allocate the aggregate purchase price to the various assets being sold, the valuation they put on each asset will usually be accepted for tax purposes so long as the parties have opposing tax positions and have acted *without collusion or fraud and the allocation is not so disproportionate as to be unreasonable. Davee v. United States,* 444 F.2d 557, 195 Ct.Cl. 184 (1971); *Republic Steel Corp. v. United States,* 40 F.Supp. 1017, 94 Ct.Cl. 476 (1941); *Annabelle Candy Co. v. Commissioner,* 314 F.2d 1 (9th Cir. 1962); *Ullman v. Commissioner,* 264 F.2d 305 (2d Cir. 1959). To the extent, therefore, that the parties agreed to allocate and in fact did allocate the aggregate price over all of the assets we would be constrained to follow that allocation as the basis to be applied in depreciating those assets. * * * [Emphasis supplied.]

There is no finding of collusion or fraud by the majority. The exchange quotation of Mesabi shares was at $40⅜ on February 19 so there is nothing disproportionate in using a $40 figure.

The majority's reason for departing from the $7,000,000 agreement is the following:

> * * * And the validity of the $7,000,000 figure is certainly open to question in light of the fact that it includes only the pre-1960 royalty claims while, no matter how the agree-

ment was in fact drafted, Mesabi was actually giving up its right to pursue its antitrust cases, and its claims for the premium value of the taconite pellets, claims which together exceeded $50,000,000. In addition, Mesabi received more than stock and money—it received the right to definite and certain royalty payments in a clearly determinable amount—a right which it had not had before and which was, in fact, the major objective of the bargain.

The $7,000,000 figure is not open to question because it was agreed upon by the parties and since there is no fraud or collusion, it should not be disturbed. As for Mesabi's rights to receive royalty payments for the iron ore, the prior lease agreement provided for a percentage-of-profit type of payment. The new agreement provided for a fixed amount per ton. It was a mere substitution of one method of computation over another. The majority opinion sounds as if an entirely new source of income was provided. This was not so. The antitrust claims were valued at zero at the request and insistence of Reserve (Tr. 129–130). The parties so decided and we should not engage in the revaluation of antitrust claims, a task most difficult and extremely speculative.

The majority treats the shareholder approval in this case as a condition precedent. I quote:

3. The material portions of the agreement of February 19, 1960, were as follows:

"1. Subject to the conditions hereof Mesabi and Reserve shall, at the Closing, execute and deliver an instrument in the form of Exhibit A hereto to amend the Assignment and an instrument in the form of Exhibit B hereto to amend the Mesabi Lease, * * *.

"2. Subject to the conditions hereof Reserve shall, at the Closing, (a) pay to Mesabi $400,000, and (b) assign to Mesabi all of Reserve's right, title and interest in all of the shares of common stock of Mesabi owned by Reserve (which Reserve represents total 163,-570 shares). * * *.

"3. Subject to the conditions hereof, Mesabi and Reserve, at or prior to the Closing, shall cause the above-mentioned arbitration proceedings to be terminated.

"4. Subject to the conditions hereof, Mesabi and Reserve, at or prior to the Closing, shall

* * * The shareholders' approval was treated throughout as a most significant condition precedent, not as a condition subsequent as in *Herbert J. Investment.* In short, while the present parties could have presented us with a case like that one, they have not.

The majority evidently missed a material point in the transcript. Under the laws of the State of Delaware, where Mesabi was incorporated, it was not necessary to obtain shareholder approval of the February 19 settlement agreement. The board of directors of Mesabi had the authority to enter into the agreement without shareholder approval (Tr. 71–72). The provision as to Mesabi shareholder approval was put in the settlement agreement only at the request of Reserve.

A careful reading of the agreement, therefore, shows that the parties entered into a binding agreement when they signed the agreement. But they were to be discharged of their assumed obligations if the shareholders' approval did not take place. I incorporate the material portions of the agreement to show that a condition subsequent was intended.[3] The language of paragraph 9 of the agreement, which reads as follows:

9. The Closing shall be held on the fifth business day following the close of the meeting of Mesabi's stockhold-

(a) stipulate for the dismissal with prejudice of all pending actions or counterclaims of either of them against the other, its present and former officers, directors or stockholders, and (b) cause to be dismissed by stipulation of the necessary parties thereto, or move to dismiss, the abovementioned *Putterman v. Daveler* action and take all steps reasonably necessary to secure a prompt dismissal of such action.

"5. Subject to the conditions hereof, effective at the Closing, each party hereby releases the other party, its present and former officers, directors and stockholders in whatever capacity, from all claims, demands, actions or causes of action of any kind or nature, * *.

* * * * * *

"8. Performance of the obligations of Mesabi and Reserve set forth in paragraphs 1 through 5 above are subject to the conditions that approval and authorization shall have

ers approving and authorizing the matters covered by this agreement as hereinbefore provided at the office of Republic, Republic Building, Cleveland, Ohio, or at such other time and place as Mesabi and Reserve shall theretofore mutually agree. If the Closing is not held, this agreement shall become null and void and shall be without prejudice to Mesabi, Reserve, Armco and Republic, and their respective present and former officers, directors and stockholders.

clearly shows a present obligation to be discharged upon the nonoccurrence of the condition subsequent; to wit, disapproval by the shareholders.

Furthermore, as a part of the record in this case, Gilbert M. Haas, in Answer to Interrogatories,[4] filed December 30, 1970, stated as follows:

Moreover, Reserve was not concerned about the outcome of a vote by the Mesabi shareholders. Mr. Arnold Hoffman and I were in constant communication with the principal shareholders of Mesabi, and as a result of our close contact with the shareholders we were able to assure the officers of Reserve, that the shareholders of Mesabi would overwhelmingly accept and approve the terms of a Settlement Agreement recommended by the Mesabi Board of Directors. In fact, it was not until after I personally assured Mr. William Bryant, an officer of Reserve, in December 1959 that it was an absolute certainty that the shareholders of Mesabi would accept and approve the terms of any settlement recommended by the Mesabi Board of Directors, that negotiations for settlement were initiated and seriously pursued by Reserve. [At p. 3.]

\* \* \* \* \* \*

While I am unable to recall with particularity the names and holdings of many of the other stockholders who were contacted during the period February 20, 1960, through March 4, 1960, I attempted to record in my diary many of the names of the Mesabi shareholders or representatives with whom I talked during this time period. I have attached copies of the pertinent diary pages. However, at this late date I am unable to recall the specific holdings of these individuals or representatives, nor am I able to relate many of the names with the owners of record contained in the list of stockholders being supplied by Bankers Trust Company, because the majority of the principal shareholders held their shares in "street name" and under various nominees. In any event, I do recall that all the people with whom I talked approved the terms of the Settlement Agreement and that their holdings, coupled with the holdings of Messrs. Joseph, Mudd, Fine, the individual directors of Mesabi and the Axe-Haughton Fund, represented more than two-thirds of Mesabi's total 1,323,794 outstanding shares, excluding the 163,570 shares owned by Reserve. \* \* \* [At p. 7.]

The above answer by Gilbert M. Haas clearly shows that shareholder approval was only a technicality, just as much as the Interstate Commerce Commission's final approval was a technicality in *Herbert J. Investment Corp. v. United*

---

been given by the affirmative vote of a majority of all the outstanding shares of Mesabi, excluding from such majority the shares owned by Reserve.

"9. The Closing shall be held on the fifth business day following the close of the meeting of Mesabi's stockholders approving and authorizing the matters covered by this agreement as hereinbefore provided at the office of Republic, Republic Building, Cleveland, Ohio, or at such other time and place as Mesabi and Reserve shall theretofore mutually agree. If

the Closing is not held, this agreement shall become null and void and shall be without prejudice to Mesabi, Reserve, Armco and Republic, and their respective present and former officers, directors and stockholders."

4. Made part of the record by Plaintiff's Motion for Partial Summary Judgment, filed October 20, 1971. See, also; pages 7 to 11 of the uncontradicted Affidavit of Gilbert M. Haas, attached to said motion as an exhibit. See Rule 88(a) of this court.

*States,* 360 F.Supp. 825 (E.D.Wis.1973), *aff'd per curiam,* 500 F.2d 44 (7th Cir. 1974).

The agreement of February 19, 1960, was signed by Mesabi's authorized officer on February 28, 1960, and by Reserve's authorized officer on March 2, 1960. When the document was signed on the respective dates by Mesabi's officer and Reserve's officer, they knew that shareholder approval was forthcoming and that shareholder approval was just a technicality. Gilbert M. Haas was elected a director of Mesabi in 1958 and he worked closely with Arnold Hoffman, president of Mesabi, in 1958, 1959, and 1960. The majority's following finding and conclusion regarding stockholder approval were in error:

> We add that here stockholder approval, though probable, was surely not a mere formality. Mesabi stockholders had not been a docile group, as the 1958 proxy fight showed, and major blocks of shares were still in the hands of persons associated with old management. Furthermore, Mesabi had, on the record date for the vote, over 2700 individual and 250 institutional shareholders. Most of the shareholders had fewer than 100 shares, and no individual shareholder owned more than 37,154 shares directly. Since Mesabi had agreed to an absolute majority vote, non-voting shares were in effect voted against the agreement. While Mesabi's board of directors might have been convinced that those who voted would vote for the agreement, *the failure, through disinterest or inadvertence, of small shareholders to vote could have prevented ratification and must be considered a risk to final approval of the agreement.* In fact, the agreement received the vote on only 87% of the eligible shares, not the 99.9% plaintiff has claimed. [Emphasis supplied.]

They are completely contrary to Gilbert M. Haas' statement. The majority's finding that "the failure, through disinterest or inadvertence, of small shareholders to vote could have prevented rat-

ification and must be considered a risk to final approval of the agreement," the portion I have emphasized in the above quotation, is contrary to Mr. Haas' statement in the record. To substantiate Mr. Haas' statement, there is a reproduction of many pages from his memorandum book showing the names of shareholders he called.

In concluding, it is submitted that it is the record that counts and this dissent is based on the record.

**Application of Julian Miles AVERY.**

**Patent Appeal No. 74–625.**

United States Court of Customs and Patent Appeals.

June 26, 1975.

