THOMAS L. PERRY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Perry v. Commissioner
Docket Nos. 1713-74, 1714-74, 1715-74, 1716-74, 1717-74, 1718-74, 1719-74, 1730-74, 1731-74, 1735-74, 1736-74, 1739-74, 1740-74, 1741-74, 1742-74, 1743-74.
United States Tax Court
T.C. Memo 1976-381; 1976 Tax Ct. Memo LEXIS 22; 35 T.C.M. (CCH) 1718; T.C.M. (RIA) 760381; December 13, 1976, Filed *22 Petitioners, partners in Coast, entered into an agreement pursuant to which they incorporated Coast and exchanged the stock of the newly formed corporation, Nuttall, for stock of Campbell plus cash. Sale contingent upon approval of Campbell shareholders which was given on September 25, 1969 and the actual exchange took place on October 16, 1969. The cash was an amount equal to one-half of the net income of Coast in excess of $94,000 for a 6-month period plus an amount equal to the dividends that would have been payable on the shares received by petitioners had they been issued on April 1. Held, in computing petitioners' amount realized the Campbell stock is to be valued as of September 25, 1969. Held further, the cash in the amount equivalent to the dividends declared on the Campbell stock represents a portion of the sales price rather than a dividend. Jack M. Harrison and Raymond L. Heidemann, for the petitioners. Alan R. Herson, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' federal income taxes as follows: Addition
Docket
under Petitioner
Number
Year
Amount
Sec. 6653
Thomas L. Perry
1713-74
1969
$ 1,888.00
Frank M. Perry & Mary Perry
1714-74
1969
944.00
1970
1,367.00
Madeline Penacho
1715-74
1969
8,021.00
1970
818.00
Lillian M. Perry
1716-74
1969
2,006.00
Manuel Serpa & Rose Serpa
1717-74
1969
9,447.00
Thomas L. Perry & Lillian M.
1718-74
1970
264.00
Perry
1971
258.00
Joseph Penacho & Madeline
1719-74
1971
1,778.00
Penacho
Joseph P. Soares & Eva
1730-74
1969
17,357.00
Soares
1739-74
1970
3,051.32
1971
1,599.41
Edward X. Madruga & Lucile F.
1731-74
1969
10,294.00
Madruga
Dorothy M. Soares
1735-74
1969
6,441.00
Manuel Silva & Mary J. Silva
1736-74
1969
3,452.00
$173.00
Frank H. Gonsalves & Ruth S.
1740-74
1969
10,147.00
Frank H. Gonsalves & Ruth S.
1740-74
1969
10,147.00
Gonsalves
George J. Soares
1741-74
1969
6,347.00
Joseph Penacho
1742-74
1969
8,022.00
1970
818.00
Robert K. Cleator &
1743-74
1969
2,759.00
Elizabeth S. Cleator
1970
884.00
1971
2,760.00
*23 Due to concessions by the parties we must decide: (1) which is the correct date on which to value the stock petitioners received in connection with a sale of their business for purposes of computing their amount realized; and (2) whether certain sums of money received by petitioners in connection with the sale were a portion of the purchase price as set forth in the Agreement or were a dividend. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. All of the petitioners resided in San Diego County, California at the time of the filing of their respective petitiones herein. All of the returns at issue were filed on the cash basis of accounting with the district director of internal revenue, Los Angeles, California. As of January 8, 1969 each petitioner, or his or her spouse, was a partner in Coast Equipment Company (hereinafter Coast). On that date Coast offered to sell to Campbell Machine, Inc., a California corporation (hereinafter Campbell), all of the business and properties of Coast in exchange for common stock of Campbell. On February 21, *24 1969 Nuttall-Styris, Inc., a California corporation (hereinafter referred to as Nuttall), was formed for the purpose of succeeding to the business and properties of Coast. On March 17, 1969, an organizational meeting of Nuttall's board of directors was held. Robert K. Cleator, Roy M. Cleator, and Thomas L. Perry were elected directors. They then elected the following officers: Robert K. Cleator, President; Thomas L. Perry, Vice President and Treasurer; and Roy M. Cleator, Secretary. These individuals served in the above capacities until their removal on October 16, 1969. At the meeting it was resolved that Nuttall enter into the reorganization agreement which is the source of the instant controversy. On March 24, 1969 Coast, Nuttall, and Campbell entered into a reorganization agreement (hereinafter the Agreement). On this date the fair market value of the Campbell stock was $18 per share. Pursuant to section 19.4 thereof, the Agreement superceded all prior agreements entered into between the parties. It provided, in pertinent part: 1.1 Partners hereby agree to sell and transfer, and Nuttall-Styris hereby agrees to purchase and acquire, at 9:00 A.M. o'clock, April 1, 1969 ("the *25 Asset Closing") * * * each and every of the assets, properties, rights, title, interests and estate of the Partnership * * *. 1.2 Nuttall-Styris hereby agrees to sell and issue to Partners, for and in consideration of the assets referred to in Paragraph 1.1, the aggregate shares of the Common Stock of Nuttall-Styris set forth in Exhibit "A" attached hereto. * * *
4.1 Effective the deliveries required by Article 2, Nuttall-Styris will pay and discharge when due, and hold Partners free and harmless from, all liabilities (i) existing as of close of business, March 31, 1969, by reason of or on account of the Partnership and (ii) disclosed to Nuttall-Styris by a writing of Partners delivered to Nuttall-Styris at the Asset Closing; said writing will disclose, with respect to each liability, the name of the creditor, the approximate amount of the liability and the due (dates) thereof. * * *
6.1.2 That, consistent with California Business and Professions Code Section 16601, none of the Partners will, without the express prior written consent of Campbell, carry on, or be employed in, a business in San Diego County, California, similar to that of the Partnership, so long as Campbell or any *26 of its subsidiaries carries on a like business in said county, or for a period ending March 31, 1974, whichever period shall be the shorter. For the purposes of this paragraph, Nuttall-Styris shall be deemed a subsidiary of Campbell to the period ending with the Stock Closing. * * *
8. Exchange of Shares
8.1 Partners hereby agree to sell, assign and transfer to Campbell, at 9:00 A.M. o'clock of the date provided for in Paragraph 8.2 ("the Stock Closing"), * * * all of the shares evidenced by the Nuttall-Styris Certificates, and Campbell hereby agrees to sell and issue to Partners, for and in consideration of the foregoing, 60,938 shares of the Common Stock of Campbell, par value $1.00 per share.* * * 8.2 The date upon which the Stock Closing shall occur shall be (i) the twenty-first business day next following the 1969 annual meeting of shareholders of Campbell or any adjournment or adjournments thereof or any special meeting held in lieu of the annuel meeting or (ii) December 31, 1969, whichever shall first occur. The By-Laws of Campbell provide that the annual meeting shall be held on the last Thursday of July * * *. * * *
10. Payment to Partners *27 Dependent Upon Partnership Profits
10.1 If the review and audit described in Article 9 discloses that the net profit of the Partnership for the period October 1, 1968 through close of business, March 31, 1969, to be in excess of $94,000.00, Campbell will at the Stock Closing pay and deliver to Partners, in the proportions and manner set forth in Paragraph 13.2.2, funds equal to one-half of said excess. 11. Dividends Upon Campbell's Shares
11.1 Campbell will, at the Stock Closing, pay and deliver to Partners, in the proportions and manner set forth in Paragraph 13.2.3, an amount equal to all dividends which, if the Campbell Certificates had been issued on April 1, 1969, would be payable on the shares evidenced by the Campbell Certificates during the period ending at the Stock Closing. * * *
14. Assumption by Campbell of Partners Obligations
14.1 Effective the deliveries required by Article 13, Campbell will pay and discharge when due, and hold Partners free and harmless from, all liabilities (i) assumed by Nuttall-Styris pursuant to Article 4 and (ii) disclosed by the certified statement of assets, liabilities and net book value described in Paragraph 9.1. Further, Article 18 of *28 the Agreement imposed several conditions upon the parties thereto and further provided that the failure to satisfy any one of these conditions would result in the termination of the Agreement without any party incurring any further obligation thereunder except that Campbell was required to reimburse Nuttall for any funds it outlayed for the acquisition of a title policy. These conditions and their dates of satisfaction are as follows: a. The delivery of certain title documents required by Article 2 was satisfied on or about April 1, 1969. b. Certain obligations of the partners of Coast required by Article 3 were satisfied on or about May 1, 1969. c. The condition that Peat, Marwick, Mitchell & Co. prepare certified financial statements of Coast reflecting a net book value of not less than $872,000 was satisfied on or about June 6, 1969. d. The condition that Campbell obtain a stock permit from the California Corporations Commissioner for the issuance of 60,938 shares of Campbell on or before the stock closing date was satisfied on or about August 19, 1969. e. The condition that Campbell obtain a listing order for the subject 60,938 shares of Campbell stock from the American *29 Stock Exchange on or before the stock closing date was satisfied on October 3, 1969. f. The Article also required that the shareholders of Campbell approve the exchange of stock at their 1969 annual meeting. A notice of special meeting in lieu of the annual meeting of shareholders of Campbell, together with an accompaning proxy statement, was mailed on September 2, 1969 to all shareholders of record at the close of business on August 29, 1969. As of the date of mailing of the notice and proxy, the fair market value of each share of Campbell stock was $10.12. The exchange of Campbell stock for stock of Nuttall was approved by the Campbell shareholders at a special meeting in lieu of the annual meeting on September 25, 1969.As of September 25, 1969, the fair market value of each share of Campbell stock was $9.12. Pursuant to the terms of the Agreement, Coast transferred to Nuttall on April 1, 1969, all of the assets of Coast in consideration for Nuttall's assumptionof disclosed liabilities of Coast and the issuance to the partners of Coast of 1,500 shares of the capital stock of Nuttall. On April 1, 1969 the fair market value of each share of Campbell stock was $18. At all times *30 subsequent to April 1, 1969 Nuttall carried on the business previously conducted by Coast. On April 2, 1969 the Tolle Company, which was retained by Campbell to handle public relations, published a news release advising the public that the asset-for-stock exchange had been accomplished and that the proposed acquisition of Nuttall by Campbell would be submitted to a vote of Campbell's shareholders at their next annual meeting. On or about June 30, 1969 Campbell published its annual report to the shareholders for its fiscal year ended March 31, 1969 in which it announced that Campbell had entered into an agreement to acquire all of Nuttall's stock for stock of Campbell and cash subject to the approval of the shareholders of Campbell. The exchange of stock was completed on October 16, 1969. In acquiring the Nuttall stock, Campbell issued to the former partners of Coast 60,938 shares of Campbell stock; made cash payments in the amount of $9,140.70 representing the amount of dividends which would have been paid on the 60,938 shares had they been issued on April 1, 1969; and paid $43,330 which represented one-half of the net income of Coast in excess of $94,000 for the period October *31 1, 1968 through March 31, 1969. On October 16, 1969, the fair market value of each share of Campbell stock was $14.75. The delay between the completion of the initial step in the transaction, involving the transfer of assets and disclosed liabilities of Coast to Nuttall in exchange for stock of Nuttall and the completion of the second step, which involved the exchange of stock-for-stock plus cash was caused by: a. the fact that the books of Coast had never been audited which resulted in delaying the completion of the certified audit by Peat, Marwick, Mitchell & Co.; b. the requirement by the Securities Exchange Commission that additional information pertaining to the disclosure of the relationship of George Soares and Joseph Penacho to Coast and Campbell be supplied; c. the Securities Exchange Commission's refusal to accept the certified audit statement by Peat, Marwick, Mitchell & Co. for a period of less than 1 year. Such delay was not, however, caused by the principals, lawyers, accountants and other agents of Campbell, Nuttall, and Coast who performed their respective responsibilities with all due speed and diligence. Campbell started the process of taking over the management *32 and operation of Nuttall's business on September 25, 1969 and on that date commenced the process of making all decisions with respect to the management and operation of Nuttall. Accordingly on September 25, 1969, Robert K. Cleator informed the employees of Nuttall that Campbell had acquired control of Nuttall. Further Campbell offered 5 year employment contracts to Robert K. Cleator and Thomas L. Perry, each of which was to be effective October 1, 1969 and assessed Nuttall a $15,000 management fee commencing on that date. On October 16, 1969, Nuttall removed its entire board of directors and amended its By-Laws to increase the authorized number of directors to seven. The following named individuals were elected to serve as directors: George G. Alameda, Robert K. Cleator, August J. Felando, Frank H. Gonsalves, Edward X. Madruga, Frank M. Perry, Joseph P. Soares George G. Alameda and August J. Felando were also members of the board of directors of Campbell, [2] the latter being the Secretary of Campbell. The newly *33 elected board of directors of Nuttall held a special meeting on November 20, 1969. All of the newly-elected directors were present. The directors considered the scheduling of regular meetings of the board, the payment of fees for attending directors' meetings, and adopted the format used by Campbell. It also removed two of the old officers of Nuttall who had served from the date of inception of the corporation, Thomas L. Perry and Roy M. Cleator, and nominated and elected new officers as follows: Robert K. Cleator
President
Thomas L. Perry
Vice President
David Small [3]
Treasurer
August J. Felando
Secretary
William N. Jenkins [4]
Assistant Secretary
The new board of directors reviewed authorizations to sign the checks and other instruments drawn on commercial accounts of the company and subsequent to such review nominated and appointed any two of the following acting together to sign such instruments: Robert K. Cleator, Thomas L. Perry and Thelma Swart. The board passes a further resolution that the company establish a $250,000 line of credit at Security *34 Pacific National Bank. Petitioners, in reporting the above transaction on their respective income tax returns, treated the exchange of their partnership interest in Coast for the stock of Nuttall as a taxable event and recognized the gain realized in connection therewith. They further took the position that their exchange of Nuttall stock for Campbell stock was a taxable event and valued the Campbell stock as of September 25, 1969. Hence they each claimed a loss on the exchange. Respondent determined that the receipt of the stock of Nuttall by the partners of Coast in exchange for the assets of Coast was without substance for tax purposes and treated the above events as one transaction--the sale of Coast to Campbell for 60,938 shares of Campbell and $43,330. He further determined that the Campbell stock was owned by petitioners on April 1, 1969 at which time its value was $18, per share. Finally, he determined that the $9,140.70 paid pursuant to section 11.1 of the Agreement was in fact dividend income to the partners of Coast. OPINION Issue 1: The Valuation Date
On March 24, 1969 Nuttall, Campbell, and the partners of Coast entered into an Agreement pursuant to which the assets *35 of Coast were to be transferred to Nuttall in exchange for the stock of Nuttall. The Nuttall stock, upon the satisfaction of certain conditions, was then to be exchanged for 60,938 shares of the common stock of Campbell plus cash. Under the Agreement the cash was to be an amount equal to one-half of the net income of Coast in excess of $94,000 for the 6-month period ended March 31, 1969 plus an amount equal to the dividends that would have been payable on the 60,938 shares had they been issued to the partners on April 1, 1969. On April 1, 1969, the assets of Coast were transferred to Nuttall in exchange for the stock thereof. The last two conditions set forth in the Agreement were satisfied on September 25, 1969 and October 3, 1969, respectively, and the exchange of Nuttall stock for Campbell stock plus cash took place on October 16, 1969.
The instant controversy has its genesis in the fluctuations in the fair market value of the common stock of Campbell between April 1, 1969 and October 16, 1969. Petitioners' position is that the exchange of their partnership interests for the stock of Nuttall was a taxable event falling outside the ambit of section 351, I.R.C. 1954. Accordingly, *36 they recognized the gain therefrom on their respective income tax returns. They further contend that their exchange of Nuttall stock for Campbell stock plus cash was also a taxable event and that the September 25 value of the Campbell shares, $9.12, is the proper value to be utilized in computing the amount realized in connection with this exchange. Respondent contends that the aforenoted events amount to no more than a sale of the Coast assets to Campbell and that the April 1 value of the Campbell stock, $18, must be utilized in arriving at the amount realized for purposes of computing gain or loss on the alleged sale of assets. Alternatively, respondent asserts that the October 16 value, $14.75, is the proper value for computing petitioners' amount realized. At the outset we note that it is unnecessary for us to decide which party has correctly characterized the aforenoted transaction.Whether these are two transactions as petitioners claim, or whether the situation is one calling for the application of the steptransaction doctrine as contended by respondent, the tax result is the same. Further, the tax results flowing from the transaction at issue are in no way affected by the *37 applicability or inapplicability of section 351. [5] Hence, we need only decide which date is the proper date for valuing the Campbell shares in computing the amount realized.
We agree with petitioners that the correct valuation date is September 25, 1969. When sale for tax purposes takes place is a question of fact which must be decided by weighing all of the facts presented. Gordon J. Harmston,61 T.C. 216 (1973), affd. 528 F. 2d 55 (9th Cir. 1976). As the court stated *38 in Commissioner v. Segall,114 F. 2d 706, 709-710 (6th Cir. 1940), reversing on other grounds 38 B.T.A. 43, cert. den. 313 U.S. 562 (1941): There are no hard and fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must beviewed as a whole and in the light of realism and practicality. Passage of title is perhaps the most conclusive circumstance. Transfer of possession is also significant. A facor often considered is whether there has been such substantial performance of conditions precedent as imposes upon the purchaser an unconditional duty to pay. [Citations omitted.] Put another way, a sale for tax purposes takes place when the benefits and burdens of ownership pass from the seller to the buyer. Gordon J. Harmston,supra, and cases cited therein at 228. We think it obvious that the approval of the Campbell shareholders was an important condition precedent to the Agreement. Absent such approval Campbell was under no obligation to acquire the Nuttall stock and petitioners were not entitled to the Campbell stock and cash. It was on September 25, 1969, the date of approval *39 by Campbell's shareholders, that petitioners became entitled to the Campbell stock and Campbell commenced taking over the operations of Nuttall. Implicit in respondent's assertion that April 1 is the proper valuation date is the view that shareholder approval was to be expected as of April as a matter of course. We disagree. Had Campbell been a closely held corporation controlled by the same individuals who negotiated the Agreement on behalf of Campbell, respondent's position might have some merit. However, this was not the case. In light of Campbell's size, its large number of shares outstanding and the fact that its directors and officers owned only approximately 20 percent of its outstanding stock, we are unable to say that the Campbell shareholders would have been but a rubber stamp. In fact had the assets of Nuttal been destroyed by fire on September 1, or had the Campbell stock risen drastically in value between April 1 and September 25, we doubt whether the requisite shareholder approval would have been granted. In this connection it is clear that had the assets of Nuttal been destroyed prior to September 25 and shareholder approval been withheld the loss would have fallen *40 on petitioners rather than Campbell. Further, absent shareholder approval, any profit or loss sustained by Nuttal between April 1, 1969 and September 25, 1969 would ultimately be borne by petitioners, not Campbell. Thus, it is clear that the benefits and burdens of ownership of Nuttall passed to Campbell on September 25. It was on that date that petitioners became entitled to the Campbell stock and the value of such stock on September 25 should be utilized in computing their amount realized. Fordyce v. Helvering,76 F. 2d 431 (D.C. Cir. 1935); C.M. Hall Lamp Co. v. United States,201 F. 2d 465 (6th Cir. 1953); Anita Owens Hoffer,24 B.T.A. 22 (1931); Mahlon D. Thatcher,46 B.T.A. 869 (1942), revd. on another issue 137 F. 2d 128 (10th Cir. 1943).
Respondent also seeks to buttress his contention that April 1 is the correct valuation date by pointing to the following: (1) Campbell took over dominion and control of the Coast assets on April 1. (2) The parties to the Agreement intended the transfer to be complete on April 1. (3) There was no contractual provision for an increase or decrease in the amount of cash paid by Campbell by reason of the earnings or losses of Nuttall during *41 the period ended with the exchange of shares. Hence, respondent argues, all earnings of Nuttall during this period inured to the benefit of Campbell. Respondent's first two contentions are belied by the facts. Campbell took dominion and control of the Coast assets subsequent to the shareholder approval, not on April 1. Moreover, the terms of the Agreement clearly indicate that the transaction was not to be consummated until shareholder approval occurred. In light of the fact that the next meeting of the Campbell shareholders was scheduled for the last Thursday in July it is obvious that the parties did not intend the transaction to be consummated on April 1. Finally, respondent's third point presupposes automatic shareholder approval which as noted above was a condition not to be assumed. Furthermore, through such approval the Nuttall shareholders became Campbell shareholders and ultimately became entitled to share in part of Nuttall's profits during the period ended September 25. Respondent, alternatively, has asserted that October 16, the date of the actual exchange is the proper valuation date. We find this contention to be without merit. We have found that September 25, *42 was the date on which the Agreement became binding on all parties and the benefits and burdens of ownership passed to Campbell. Hence, for tax purposes, this date, and not the date of delivery of the shares, is the proper valuation date. Fordyce v. Helvering,supra;Bankers Trust Company v. United States,518 F. 2d 1210 (Ct. Cl. 1975), cert. den. 424 U.S. 966 (1976). Although the foregoing serves to dispose of this issue, we think it relevant to add one final note before proceeding to the next issue. The last condition set forth in the Agreement to actually be fulfilled was the requirement that the 60,938 Campbell shares be listed with the American Stock Exchange. This was done on October 3, 1969. However, the conduct of the parties, particularly the transfer of dominion and control on September 25, 1969, makes it clear that they believed the failure of such condition to be highly unlikely. In effect the parties themselves disregarded the condition and evidenced their intent to render the Agreement binding on September 25 with the listing in effect being transformed into a condition subsequent. In Herbert J. Investment Corporation v. United States,360 F. Supp. 825 (E.D. Wis. 1973), *43 affd. per curiam 500 F. 2d 44 (7th Cir. 1974) the taxpayer, a trucking company, agreed to sell its assets for 100,000 shares of stock of another company plus cash based on its net book value as of the date of the transfer of temporary control. Temporary authority was granted by the ICC on March 26, 1968 and temporary control was assumed by the buyer on April 1, 1968. Permanent authority, required by statute, was later granted by the ICC and title then passed. The court held that April 1 was the proper date on which to value the shares of the acquiring corporation stating at 827-828: I believe that the clear intentions of the parties are controlling. Certainly full approval by the ICC was, as the government contends, more than a mere formality; the purchase could not be final without it. The parties recognized that fact by utilizing language which tied consummation of the arrangement with final approval. The consummation itself, however, was actually nothing more than formalization of the arrangement effected by the parties on April 1. The parties recognized the importance of final approval but were so certain of its forthcoming that they fully committed themselves to the impact *44 of their agreement on April 1, 1968, and treated the possible failure of final approval as a real, but highly unlikely, condition subsequent. The recognition given ICC approval in the agreement should not becloud the true circumstances. A sale may be completed for tax purposes despite the existence of future contingencies. The time of transfer of dominion and control over assets which are the subject of a sale is a more important consideration than the time of ultimate payment or conveyance of formal title. [Citations omitted.] We agree with the above analysis and find that case and the instant case to be virtually indistinguishable on this point. Both the listing condition and ICC approval were future contingencies amounting to mere formalities. Further the parties treated them as such and fully committed themselves to fulfillment of the Agreement prior to the satisfaction thereof. Hence, the highly unlikely failure of this condition is not a sufficient basis on which to delay the consummation of the sale at issue for tax purposes and we find October 3 not to be the proper valuation date. Issue 2: The Dividend
As noted previously, petitioners received cash in an amount equal *45 to the dividends that would have been paid on the 60,938 Campbell shares had they been issued on April 1, 1969. Respondent's position is that this amount represents a dividend to petitioners rather than a portion of the purchase price received for their Nuttal stock.
We disagree. Respondent has cited no authority to buttress his conclusion and we have found none. To the contrary the majority of cases involving the issue of whether a payment from a corporation was a dividend involved what was unquestionably a dividend and the issue was whether the dividend was taxable to the seller or to the buyer. See Sam E. Wilson, Jr.,27 T.C. 976 (1958), affd. per curiam 255 F. 2d 702 (5th Cir. 1958). Here the issue is whether the payment is a dividend in the first instance. However, unlike prior cases involving the present issue, the distribution was made by the corporation whose stock was being sold to the selling shareholder with a corresponding reduction in the sales price. The corporation was merely the source of the payment of a portion of the sales price. See Waterman SteamshipCorporation v. Commissioner,430 F. 2d 1185 (5th Cir. 1970), cert. den. 401 U.S. 939 (1971). Hence these cases *46 are also distinguishable. In the final analysis the parties by the Agreement and their actions treated the amount of dividends that would have been payable with respect to the 60,938 Campbell shares as part of the purchase price for the Nuttall shares. We think this is the clear intent of the parties and the dividend that would have been so payable was no more than a measure by which to compute the consideration due petitioners for their Nuttall stock. [6] Cf. Frithiof T. Christensen,33 T.C. 500 (1959). Decisions will be entered for the Petitioners in docket Nos. 1715-74, 1718-74, 1719-74, 1730-74, 1731-74 and 1742-74. Decisions will be entered under Rule 155 in docket Nos. 1713-74, 1714-74, 1716-74, 1717-74, 1735-74, 1736-74, 1739-74, 1740-74, 1741-74 and 1743-74. Footnotes
1. Cases of the following petitioners are consolidated herewith: Frank M. Perry and Mary Perry, docket No. 1714-74; Madeline Penacho, docket No. 1715-74; Lillian M. Perry, docket No. 1716-74; Manuel Serpa and Rose Serpa, docket No. 1717-74; Thomas L. Perry and Lillian M. Perry, docket No. 1718-74; Joseph Penacho and Madeline Penacho, docket No. 1719-74; Joseph P. Soares and Eva Soares, docket Nos. 1730-74 and 1739-74; Edward X. Madruga and Lucile F. Madruga, docket No. 1731-74; Dorothy M. Soares, docket No. 1735-74; Manuel Silva and Mary J. Silva, docket No. 1736-74; Frank H. Gonsalves and Ruth S. Gonsalves, docket No. 1740-74; George J. Soares, docket No. 1741-74; Joseph Penacho, docket No. 1742-74; and Robert K. Cleator and Elizabeth S. Cleator, docket No. 1743-74.↩
2. As of April 1, 1969, Campbell had 484,428 shares of common stock issued and outstanding. As of July 31, 1969, 114,282 of these shares were held by Campbell's directors.↩
3. David Small was the controller of Campbell. ↩
4. William N. Jenkins was also on Campbell's board of directors and served as its general counsel.↩
5. This may be illustrated as follows, assuming for all purposes that the aggregate basis in the partnership assets is 10, that the fair market value of the Campbell stock on April 1 and September 25 are 18 and 9, respectively, and that September 25 is the proper valuation date. ↩
Two transactions with
Sec. 351 applicable to
Two transactions Asset Sale
the incorporation
without Sec. 351
Amount realized (Sept. 25) 9
Amount realized (Apr. 1) 18
Amount realized (Apr. 1) 18
Adjusted basis 10
Adjusted basis 10
Adjusted basis 10
Loss recognized (1)
Gain (not recognized) (8)
Gain recognized 8
Amount realized (Sept. 25) 9
Amount realized (Sept. 25) 9
Adjusted basis 10
Adjusted basis 18
Loss recognized (1)
Loss recognized (9)
Net loss recognized (1)
6. In this connection we note that petitioners were not shareholders of record of Campbell on April 1. Had Campbell declared a dividend and failed to pay such to petitioners they could only have sued the corporation therefor as part of the purchase price and not as shareholders of record.↩